DAWN SESTITO (S.B. #214011)
dsestito@omm.com
MATTHEW R. COWAN (S.B. #281114)
mcowan@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone:     (213) 430-6000
Facsimile:     (213) 430-6407

KIMBERLY BRANSCOME (S.B. #255480)
kbranscome@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2029 Century Park East, Suite 2000
Los Angeles, CA 90067-3006
Telephone:     (310) 982-4350
Facsimile:     (310) 943-1748

*Counsel for Defendant Exxon Mobil Corporation*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, INC.; SURFRIDER FOUNDATION, INC.; HEAL THE BAY, INC.; and BAYKEEPER, INC.; each a California Nonprofit,<br><br>Plaintiffs,<br><br>v.<br><br>EXXONMOBIL CORPORATION, a New Jersey Corporation, and DOES 1-10,<br><br>Defendants. | Case No. 3:24-cv-07288-RS<br><br>**AMENDED NOTICE OF REMOVAL OF CIVIL ACTION**<br><br>Removed from the Superior Court of the State of California for the County of Francisco, Case No. CGC-24-618321<br><br>Action Filed: September 23, 2024 |

1  **TO THE CLERK OF THE ABOVE-TITLED COURT AND PLAINTIFFS SIERRA**

2  **CLUB, INC.; SURFRIDER FOUNDATION, INC.; HEAL THE BAY, INC.; AND**

3  **BAYKEEPER, INC.:**

4       PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1331, 1332, 1333, 1441, and

5  1442, Defendant Exxon Mobil Corporation ("ExxonMobil") hereby removes to this Court—with

6  reservation of all defenses and rights—the state court action described below:[1]

7  **I.   INTRODUCTION**

8       1.    ExxonMobil files this Amended Notice of Removal from the San Francisco

9  County Superior Court to the United States District Court for the Northern District of California,

10  invoking: original diversity jurisdiction under 28 U.S.C. § 1332(a); original jurisdiction under the

11  Class Action Fairness Act of 2005 ("CAFA"), *id*. § 1332(d); original maritime jurisdiction under

12  *id.* § 1333; and original "arising under" federal question jurisdiction, pursuant to the federal

13  enclave doctrine, *id.* § 1331.  *See* 28 U.S.C. § 1441.  ExxonMobil also invokes federal officer

14  removal under 28 U.S.C. § 1442(a)(1).

15       2.    This Court has original jurisdiction under Section 1332(a) because (a) there is

16  complete diversity between Plaintiffs and ExxonMobil, and (b) the amount in controversy

17  exceeds $75,000.

18       3.    This Court has original jurisdiction under CAFA because the complaint pleads a

19  representative action under California law akin to a class action under Rule 23 of the Federal

20  Rules of Civil Procedure; minimal diversity exists between the parties; the matter in controversy

21  exceeds $5,000,000 exclusive of interest and costs; and the putative class Plaintiffs seek to

22  represent exceeds 100 persons.  28 U.S.C. § 1332(d).

23       4.    This Court has original maritime jurisdiction under Section 1333 because the

24  alleged harm underlying Plaintiffs' claims (1) took place on navigable waters, (2) has "a

25

---

26  [1] In filing this Notice of Removal, ExxonMobil does not waive, and expressly preserves, its right
    to challenge personal jurisdiction with respect to this action.  *See, e.g., Carter v. Bldg. Material &*
27  *Constr. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000-01 (N.D. Cal. 1996) ("A petition
    for removal affects only the forum in which the action will be heard; it does not affect personal
28  jurisdiction.").

1    potentially disruptive impact on maritime commerce, and (3) bears a "substantial relationship to

2    traditional maritime activity." *Ali v. Rogers*, 780 F.3d 1229, 1235 (9th Cir. 2015).

3         5.    This Court has original "arising under" federal question jurisdiction, pursuant to

4    the federal enclave doctrine under Section 1331, because Plaintiffs' alleged injury occurred on a

5    federal enclave.

6         6.    Federal officer removal is proper under Section 1442(a)(1) because (1)

7    ExxonMobil is a "person" within the meaning of the statute; (2) Plaintiffs' claims are "for or

8    relating to" an act under color of federal office, and (3) ExxonMobil raises a colorable federal

9    defense. *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017).

10        7.    Venue is proper in this Court because it is the "district court of the United States

11   for the district and division embracing the place where [the] action is pending." 28 U.S.C.

12   § 1441(a).

13   **II.    TIMELINESS OF REMOVAL**

14        8.    On September 23, 2024, Plaintiffs Sierra Club, Inc., Surfrider Foundation, Inc.,

15   Heal the Bay, Inc., and Baykeeper, Inc.—four California nonprofit organizations—filed this

16   lawsuit in the Superior Court of the State of California for the County of San Francisco, Case No.

17   CGC-24-618321, captioned *Sierra Club, et al. v. ExxonMobil Corporation*. ExxonMobil was

18   served on October 9, 2024. A true and correct copy of all "process, pleadings, and orders" served

19   upon ExxonMobil is attached as **Exhibit A** to this Notice. 28 U.S.C. § 1446(a).

20        9.    ExxonMobil's amended notice of removal is timely because it is filed within 30

21   days after service. 28 U.S.C. § 1446(b); *Hillman v. PacifiCorp*, 2022 WL 597583, at *3 (E.D.

22   Cal. Feb. 28, 2022) ("It is well settled that a defendant's notice of removal may be amended

23   freely prior to the expiration of this initial 30-day period in which removal can be effectuated

24   under 28 U.S.C. § 1446(b)." (collecting cases)); *San Joaquin Gen. Hosp. v. Sheikh*, 2014 WL

25   4635535, at *4 (E.D. Cal. Sept. 15, 2014) ("Defendants may freely amend their notice of removal

26   during th[e] thirty day period"), *report and recommendation adopted*, 2014 WL 5698696 (E.D.

27   Cal. Oct. 30, 2014).

28

1

### III.    SUMMARY OF ALLEGATIONS

2        10.    This lawsuit seeks to hold ExxonMobil liable for creating the entire "single-use

3    plastics pollution crisis across California."  Compl. ¶ 1.  According to Plaintiffs, ExxonMobil

4    concealed from the California public that "single-use plastics" are "harmful, toxic products that

5    cannot be safely disposed through recycling or by other means" and promoted the idea "that

6    single-use plastic waste can be safely, technically, and economically disposed by landfilling,

7    recycling, or incineration."  *Id.* ¶¶ 1, 4, 37-38.  They also point to microplastics in the

8    environment.  *Id.* ¶ 2.

9        11.    Plaintiffs assert two causes of action against ExxonMobil "on behalf of themselves

10    and the California public": (1) private and public nuisance; and (2) violation of Business &

11    Professions Code § 17200 ("UCL").  *Id.* ¶ 22.

12        12.    The first cause of action alleges that ExxonMobil's conduct caused a nuisance—

13    namely, "single-use plastic pollution in California waterways and coasts, soil and air."  *Id.* ¶¶ 3-4,

14    211.  Plaintiffs seek the following relief on their public and private nuisance claims: injunctive

15    relief (including abatement); compensatory damages; prejudgment and post-judgment interest;

16    costs of proceedings; and attorneys' fees, costs and expenses.  *Id.* ¶ 240.

17        13.    Plaintiffs' UCL claim broadly alleges that ExxonMobil engaged in unfair

18    competition by allegedly promoting plastic products as recyclable.  *See id.* ¶¶ 232-37.  As relief,

19    Plaintiffs seek, on behalf of themselves and "the California public," *id.* ¶ 237, an injunction under

20    Cal. Bus. & Prof. Code § 17203; prejudgment and post-judgment interest; costs of proceedings;

21    and attorneys' fees, costs and expenses.  *Id.* ¶ 241.

22    ### IV.    THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

23        14.    Under 28 U.S.C. § 1441(a), "civil action[s] brought in a State court of which the

24    district courts of the United States have original jurisdiction, may be removed by the defendant or

25    the defendants, to federal district court" in the "the district and division embracing the place

26

27

28

where such action is pending." *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 679-80 & n.4 (9th Cir. 2006); 28 U.S.C. § 1441(a).[2]  All elements required for removal are satisfied here.

15.    Section 1442(a)(1) also permits of any civil action "against or directed to … [t]he United States or any agency thereof or any officer (or ***any person acting under that officer***) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  All elements of Section 1442(a) removal are likewise satisfied.

16.    ExxonMobil's notice of removal is timely.  *See supra* ¶ 5.

17.    This Court is the proper venue for the removed action.  A civil action "may be removed … to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  The United States District Court for the Northern District of California is the District embracing San Francisco County.  28 U.S.C. § 84(a). The San Francisco Division is the proper intradistrict assignment under Civil Local Rule 3-2(d) and General Order 44.

18.    And as explained next, this Court has original jurisdiction under Section 1332(a), CAFA, and Sections 1333 and 1331.  Removal jurisdiction is also independently proper under Section 1442(a).

**A.    This Court Has Original Jurisdiction Under Section 1332(a)**

19.    A federal court has original jurisdiction under Section 1332(a) when two elements are satisfied: (a) the parties are completely diverse, and (b) the amount in controversy "exceeds the sum or value of $75,000."  28 U.S.C. § 1332(a); *Lincoln Property Co. v. Roche*, 546 U.S. 81, 89 (2005).  Both requirements are satisfied here.

**1.    Complete Diversity Is Satisfied**

20.    Complete diversity means no plaintiff is a citizen of the same state as any defendant.  *See Demarest v. HSBC Bank USA, N.A.*, 920 F.3d 1223, 1226 (9th Cir. 2019).

---

[2] Unless otherwise noted, all emphases are added, and internal citations, quotation marks, and alterations are omitted.

21.    All plaintiffs and defendants in this case are corporations.[3]

22.    For diversity purposes, a corporation (including a nonprofit corporation) is "deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1); *Bank of Am., N.A. v. Remington Place Homeowners' Ass'n*, 836 F. App'x 580, 581 (9th Cir. 2021) (explaining that non-profit corporation is "a citizen of both its state of incorporation and … the State where it has its principal place of business"); *Mirza v. Cent. Asia Inst.*, 2014 WL 12663437, at *3 (C.D. Cal. May 27, 2014) (applying same rule to nonprofit corporations); *see also Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1183 (9th Cir. 2004) (holding that Section 1332(c) applies to determine the citizenship of any "entities incorporated under state law").

23.    All four Plaintiffs are "nonprofit organizations, each incorporated and headquartered in the State of California."  Compl. ¶ 22; *see also id.* ¶¶ 24, 26, 28, 31.  Therefore, all four plaintiffs are California citizens.

24.    ExxonMobil is incorporated in New Jersey and has its principal place of business in Texas.  Compl. ¶ 33.  Therefore, ExxonMobil is a citizen of New Jersey and Texas.[4]

25.    Because no plaintiff is a citizen of the same states of which ExxonMobil is a citizen, complete diversity is satisfied.  *Demarest*, 920 F.3d at 1226.

**2.    The Amount In Controversy Exceeds $75,000**

26.    Section 1332(a) also requires that the "[amount] in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332(a).

27.    The "amount in controversy" means the total "amount at stake in the underlying litigation," which "includes any result of the litigation, … *inter alia*, damages (compensatory,

---

[3] The Court should disregard the presence of unidentified "Doe" defendants for diversity-jurisdiction purposes.  Under 28 U.S.C. § 1441(b)(1), "[i]n determining whether a civil action is removable on the basis" of diversity jurisdiction, "the citizenship of defendants sued under fictitious names shall be disregarded."

[4] ExxonMobil is not a citizen of California, so Section 1441(b)(2) has no application.  *See* 28 U.S.C. § 1441(b)(2) (diversity jurisdiction does not support removal if any of the "defendants is a citizen of the State in which such action is brought").

AMENDED NOTICE OF REMOVAL OF CIVIL ACTION
CASE NO. 3:24-CV-07288-RS

1    punitive, or otherwise) and the cost of complying with an injunction." *Gonzales v. CarMax Auto*

2    *Superstores, LLC*, 840 F.3d 644, 648-49 (9th Cir. 2016).

3           28.     In a multi-plaintiff action (like this one), this amount-in-controversy requirement is

4    satisfied as long as "at least one" plaintiff seeks relief exceeding $75,000. *Guglielmino v. McKee*

5    *Foods Corp.*, 506 F.3d 696, 701 (9th Cir. 2007). And when a single plaintiff asserts more than

6    one claim, like Plaintiffs do here, courts must "aggregate the value of all of the plaintiff's claims

7    to determine whether the jurisdictional minimum was satisfied." *Sky-Med, Inc. v. Fed. Aviation*

8    *Admin.*, 965 F.3d 960, 966 (9th Cir. 2020).

9           29.     Here, Plaintiffs seek more than $75,000 total in relief.

10           30.     Plaintiffs seek, *inter alia*, compensatory damages for "diverting organizational

11    resources to prevent and mitigate the harms from single-use plastic pollution and to clean up

12    plastic pollution in waterways on its own private property and public property in California."

13    Compl. ¶ 223.

14           31.     Plaintiffs also request equitable relief to abate the alleged nuisance of "single-use

15    plastic pollution in California waterways and coasts, soil and air, and its associated harms."

16    Compl. ¶ 211. For amount-in-controversy purposes, the value any "nonmonetary relief … is

17    measured by the value of the object of the litigation"—here, defendant's "anticipated cost of

18    compliance." *Maine Cmty. Health Options v. Albertsons Cos.*, 993 F.3d 720, 723 (9th Cir. 2021).

19           32.     As alleged in the Complaint, Plaintiffs' claims place more than $75,000 in

20    controversy. *See, e.g.*, Compl. ¶ 161 ("Sierra Club estimates that it spent in excess of $1,800,000

21    in connection with its efforts to address plastic pollution from 2020 through 2024."), *id.* ¶ 171

22    (Surfrider), *id.* ¶ 181 (Heal the Bay). *Cf. Dart Cherokee Basin Operating Co., LLC v. Owens*,

23    574 U.S. 81, 87 (2014) ("[T]he plaintiff's amount-in-controversy allegation is accepted if made in

24

25

26

27

28

1  good faith."); *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 276 (1977) ("[T]he

2  sum claimed by the plaintiff controls if the claim is apparently made in good faith.").

3  **B.    This Court Has Original Jurisdiction Under CAFA**

4  33.    CAFA provides a separate, independent basis for original jurisdiction.

5  34.    "CAFA 'relaxed' the diversity requirements for putative class actions." *Canela v.*

6  *Costco Wholesale Corp.*, 971 F.3d 845, 850 (9th Cir. 2020) (quoting *Dart Cherokee*, 574 U.S. at

7  84). "Under CAFA, federal courts have jurisdiction over [1] a 'class action' when [2] the parties

8  are minimally diverse, i.e., any member of a class of plaintiffs is a citizen of a state different from

9  that of any defendant, and [3] the amount in controversy exceeds $5,000,000 …, and [4] when the

10  proposed class has at least 100 members.'" *Id.*; *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707

11  F.3d 1136, 1139 (9th Cir. 2013); 28 U.S.C. § 1332(d).

12  35.    Here, Plaintiffs have pleaded a de facto class action, bringing claims "on behalf of

13  themselves and the California public," Compl. ¶ 22, and CAFA's remaining elements are

14  satisfied.

15  **1.    Plaintiffs Filed A Class Action For CAFA Purposes**

16  36.    Under CAFA, a "class action" "means any civil action filed under rule 23 of the

17  Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing

18  an action to be brought by 1 or more representative persons as a class action." 28 U.S.C.

19  § 1332(d)(1). Congress intended for this definition "to be interpreted liberally," such that

20  CAFA's "application should not be confined solely to lawsuits that are labeled 'class actions' by

21  the named plaintiff or the state rulemaking authority." S. Rep. No. 109-14, at 35 (2005), as

22  reprinted in 2005 U.S.C.C.A.N. 3, 34.

23  37.    In determining whether a particular suit qualifies as a "class action," "the CAFA

24  removal inquiry focuses on the complaint's substance, not formal labels and allegations." *Pac.*

25  *Coast Fed'n of Fishermen's Ass'ns, Inc. v. Chevron Corp.*, 2023 WL 7299195, at *2 (N.D. Cal.

26  Nov. 1, 2023); *Canela*, 971 F.3d at 854 (rejecting argument that "what matters is whether a

27  plaintiff formally makes class allegations"); *see also Addison Automatics, Inc. v. Hartford Cas.*

28

1   *Ins. Co.*, 731 F.3d 740, 741 (7th Cir. 2013) (removal under CAFA jurisdiction is proper over

2   "declaratory judgment action [that] is in substance a class action").

3       38.     The "complaint's substance" here confirms that Plaintiffs have pleaded a "class

4   action" under CAFA by asserting claims "on behalf of themselves and the California public,"

5   Compl. ¶ 22, including a UCL claim for "[i]njunctive relief, pursuant to Bus. & Prof. Code

6   § 17203," *id.* ¶ 241(a). *Pac. Coast Fed'n*, 2023 WL 7299195, at *2.[5]

7       39.     Section 17203 authorizes a private plaintiff to pursue injunctive relief "on behalf

8   of others only if the claimant meets the standing requirements of Section 17204 and complies

9   with Section 382 of the Code of Civil Procedure."  Cal. Bus. & Prof. Code § 17203.  In other

10  words, the injunctive relief Plaintiffs seek "on behalf of … the California public" constitutes

11  "relief that could only be obtained in a section 382 action." *Pac. Coast Fed'n*, 2023 WL

12  7299195, at *2.  That means Plaintiffs have pleaded a Section 382 action, regardless of whether

13  their Complaint formally cited that provision.  *See id.* ("The lawsuit d[oes] not avoid becoming a

14  section 382 action just because [Plaintiffs] never cited section 382 or alleged it had satisfied

15  section 382's requirements.").

16      40.     For CAFA purposes, a "representative action" under Section 382—which "allows

17  a plaintiff to sue and seek relief on behalf of absent parties" in California courts—constitutes a

18  "class action." *Id.* at *1 (denying motion to remand representative action brought by association

19  "on behalf of itself and its members," which include "crab fishermen, fishing businesses, and

20  local fishermen's marketing associations along the West Coast").

21      41.     Section 382 provides: "If the consent of any one who should have been joined as

22  plaintiff cannot be obtained …; and when the question is one of a common or general interest, of

23  many persons, or when the parties are numerous, and it is impracticable to bring them all before

24  the court, one or more may sue or defend for the benefit of all."  Cal. Civ. Proc. Code § 382.

25      42.     "Although section 382 does not use the phrase class action, it is sometimes

26  referred to as California's class action statute, … and it is generally cited as the statute that

27  _____

28  [5] Plaintiffs also purport to bring their nuisance claims as representatives "on behalf of" the
    "California public."  Compl. ¶ 22.

authorizes class actions." *River's Side at Washington Square Homeowners Ass'n v. Superior Ct.*, 88 Cal. App. 5th 1209, 1230 (2023). But "[i]n addition to class actions," Section 382 also authorizes "representative actions"—"creatures of case law" in which "an association may be allowed to sue in a representative capacity on behalf of its members if certain requirements are met, even if the association itself suffered no damage and would otherwise lack standing to sue." *Id.*

43.     Section 382 representative actions qualify as class actions for CAFA purposes:

> As the California courts have explained, an action of this type is subject to many Rule 23–like requirements. Common questions of law and fact must predominate over individual issues…. The size of the class must be large enough to make joinder impractical…. And class representatives must give adequate notice to represented members.

*Pac. Coast Fed'n*, 2023 WL 7299195, at *1 (trade association's representative action for tort claims, including nuisance, on behalf of itself and its members was a "class action" for CAFA removal purposes).

44.     By "seeking relief that could only be obtained in a section 382 action" on both of their claims—that is, relief "on behalf of themselves and the California public," Compl. ¶ 22— Plaintiffs have pleaded a representative action under that section. *Pac. Coast Fed'n*, 2023 WL 7299195, at *2. And that is sufficient to allow removal under CAFA.

## 2.     Minimal Diversity Is Satisfied

45.     CAFA's minimal diversity element requires that "at least one plaintiff is diverse in citizenship from any defendant." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1195 (9th Cir. 2015).

46.     That requirement is necessarily satisfied here, because the named parties are completely diverse. *See* Section IV.A, *supra*.

## 3.     The Amount In Controversy Exceeds $5 Million

47.     The amount placed in controversy by Plaintiffs' claims on behalf of the California public exceeds $5 million. "[A] defendant's notice of removal need include only a plausible

allegation that the amount in controversy exceeds the jurisdictional threshold." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 924–25 (9th Cir. 2019).

48.    Under CAFA, "[i]n any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(6).

49.    Here, Plaintiffs' request for relief on behalf of all members of the California public places more than $5 million in controversy.  As explained, the Complaint seeks an abatement remedy, on behalf of the members of the California public, to remedy the alleged nuisance of single-use plastic pollution in California's beaches and oceans.  Compl. ¶ 240.  The cost to comply with an order to abate the nuisance alleged here on behalf of the class of California residents would exceed $5 million. *See Maine Cmty. Health Options*, 993 F.3d at 723; *see also supra* at ¶ 32.

50.    Plaintiffs also seek UCL injunctive relief under Section 17203.  Compl. ¶ 214. Factoring in the "anticipated cost of compliance" with any such classwide "nonmonetary relief" similarly confirms that CAFA's amount-in-controversy is satisfied. *Maine Cmty. Health Options*, 993 F.3d at 723; *cf. Doe v. Aetna, Inc.*, 2018 WL 1614392, at *4 (N.D. Cal. Apr. 4, 2018) (considering cost of compliance with UCL injunctive relief as to each plaintiff in non-class diversity action).

### 4.    CAFA Class Numerosity is Satisfied

51.    The putative class has more than 100 members, as required by CAFA.  28 U.S.C. § 1332(d)(5); *Ibarra*, 775 F.3d at 1195.  Plaintiffs seek to represent the entire California public, which consists of tens of millions of people.

### C.    This Court Has Original Jurisdiction Under Section 1333

52.    This Court has original admiralty or maritime jurisdiction under 28 U.S.C. § 1333. "Tort claims may sound in admiralty jurisdiction if they satisfy a test … showing that the claim has the requisite maritime flavor" by establishing the following "three components": "The relevant tort or harm must have (1) taken place on navigable water (or a vessel on navigable water having caused an injury on land)" (the "location test"), (2) "a potentially disruptive impact on

- 11 -

maritime commerce, and (3) a substantial relationship to traditional maritime activity" (together with (2), the "nexus" or "connection" test). *Ali*, 780 F.3d at 1235; *In re Blue Water Boating, Inc.*, 786 F. App'x 703, 704 (9th Cir. 2019); *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009). Plaintiffs' allegations satisfy all three elements of original admiralty jurisdiction under Section 1333.

53.    **The location test is satisfied.** The location test is satisfied because the alleged wrongs "occurred on navigable water." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). The location test turns on the "situs" of the tort, meaning "the place where the injury occurs" or "takes effect"—not where the allegedly injurious conduct occurred. *Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005). Accordingly, "the first prong of the test for admiralty jurisdiction … simply require[es] that 'the injury occur on [navigable] water.'" *Id.* at 1084 n.6. And waters qualify as "navigable when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *In re Garrett*, 981 F.3d 739, 741 (9th Cir. 2020).

54.    Here, Plaintiffs allege an injury that "occur[red] on navigable waters" for purposes of the "location test." *Id.* The "situs" of the alleged injury—i.e., "where the nuisance exists," *People v. Selby Smelting & Lead Co.*, 163 Cal. 84, 95 (1912)—essentially encompasses all of California's "waterways." Compl. ¶ 237; *see also id.* ¶¶ 154, 211-12, 223, 231. That includes California's "navigable waters," Compl. ¶ 235, such as "lakes," bays, and the Pacific "ocean," *id.* ¶¶ 151 (Monterrey Bay National Marine Sanctuary, San Francisco Bay, San Diego Bay), 154, 231, 235, 237.

55.    These California waterways, the situs of the alleged harm, are "neither enclosed nor obstructed," but rather remain "accessible for trade or travel," both interstate and international. *Mission Bay*, 570 F.3d at 1127 ("the rest of Mission Bay [besides "reserved area"], as well as the Pacific Ocean" qualify as navigable). That means the allegedly harmed waterways

in California indisputably include "navigable waters," *id.*, as alleged in the Complaint itself. Compl. ¶ 235 ("navigable waters").  The location test is satisfied.

56.      In addition, the situs of the harm is "navigable waters," satisfying the location test, even for the harms Plaintiffs allege initially arise from land-based plastic pollution, such as "leachate" that "manages to permeate into soil and groundwater," Compl. ¶ 45, eventually reaching navigable waters, including the Monterey Bay National Marine Sanctuary, *id.* ¶ 151 (alleging plastic pollution has "been found in some of the most remote parts of California," including waters).

57.      **The Nexus Test.**  Both components of the nexus test are satisfied, too—(2) the alleged "tort has the potential to disrupt maritime commerce," and (3) it bears "a substantial relationship to traditional maritime activity."  *Mission Bay*, 570 F.3d at 1128.

58.      ***Impact on Maritime Commerce.***  To start, the alleged torts have a "potentially disruptive impact on maritime commerce."  *Grubart*, 513 U.S. at 534.  The Ninth Circuit "[h]as taken an inclusive view of what general features of an incident have a potentially disruptive effect on maritime commerce."  *Mission Bay*, 570 F.3d at 1128.  The test is satisfied as long as the alleged conduct "could hypothetically have an effect on maritime commerce.  It does not require that any impact actually occurred."  *Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 815 n.31 (9th Cir. 2002).

59.      The maritime-commerce-impact test is easily satisfied here.  Plaintiffs allege that plastic pollution interferes with maritime commercial fishing in California, for example.  Compl. ¶¶ 151 (alleging "fish and shellfish for sale in markets" affected by "plastics" pollution); *see also id.* ¶ 154 ("there are relatively few components to marine ecosystems that are unaffected by plastic pollution," which "impacts waterways, coasts, and oceans everywhere").  Indeed, according to Plaintiffs, "[a]nnual global losses from all industries afflicted by marine plastic pollution reach an estimated $13 billion."  Compl. ¶ 155.  That direct and quantifiable alleged disruption bears a much closer nexus to commercial maritime activity, including fishing, than other conduct the Ninth Circuit has found sufficient to establish jurisdiction.  *See Mission Bay*, 570 F.3d at 1128-29 (collecting examples, including "cruise ship's treatment of passengers

1    generally," an assault that "depriv[ed] [a] vessel of a [single] deckhand," and a negligent search-

2    and-rescue).

3        60.    ***Substantial maritime relationship.***  Finally, the alleged conduct Plaintiff

4    challenges bears a "substantial relationship to traditional maritime activity."  *Grubart*, 513 U.S. at

5    534.  The "substantial relationship" aspect of the "nexus" test is likewise "interpreted broadly."

6    *Tobar v. United States*, 639 F.3d 1191, 1198 (9th Cir. 2011); *see also Sisson v. Ruby*, 497 U.S.

7    358, 367 (1990) (describing "broad perspective demanded by the second aspect of the [nexus]

8    test").  Courts define "the relevant 'activity' … not by the particular circumstances of the

9    incident, but by the general conduct from which the incident arose."  *Sisson*, 497 U.S. at 364; *see*

10   *also Ali*, 780 F.3d at 1235 ("We look at a tort claim's general features, rather than at its minute

11   particulars, to assess whether there is the requisite connection.").

12       61.    The substantial relationship analysis proceeds in two steps.  "[A]s a first step,"

13   courts "define what constitutes the activity giving rise to the incident."  *Gruver v. Lesman*

14   *Fisheries Inc.*, 489 F.3d 978, 983 (9th Cir. 2007).  "The relevant activity is not merely the event

15   immediately surrounding the injury[, but] the behavior of any putative tortfeasor that is an

16   arguably proximate cause of the injury."  *Id.* at 985.  Then, "[h]aving identified the relevant

17   activity, [the] next task is to determine how broadly or narrowly to characterize the [relevant]

18   dispute for the purposes of the comparison to traditional maritime activity."  *Id.*  Here, both steps

19   lead to the conclusion that ExxonMobil's alleged activity bears a sufficient connection to

20   "traditional maritime activity" to support jurisdiction.

21       62.    Start with the first step—identifying the relevant activity.  Plaintiffs have alleged

22   that ExxonMobil's conduct violated California Fish & Game Code §§ 5650, 5650.1, and 5652,

23   which "which make it 'unlawful to deposit in, permit to pass into, or place where it can pass into

24   the waters of this state . . . [a]ny substance or material deleterious to fish, plant life, mammals, or

25   bird life,' Cal. Fish & G. Code § 5650, and make it 'unlawful to deposit, permit to pass into, or

26   place where it can pass into the waters of the state, or to abandon, dispose of, or throw away,

27   within 150 feet of the high water mark of the waters of the state, any cans, bottles, garbage, motor

28   vehicle or parts thereof, rubbish, litter, refuse, waste, [or] debris.'" Fish & Game Code

- 14 -

§ 5652(a)." Compl. ¶ 232. Plaintiffs further allege that ExxonMobil "created, contributed to, and/or assisted in creating conditions that constitute a nuisance by causing single-use plastic pollution in California waterways and coasts, soil and air, and its associated harms." *Id.* ¶ 211. Put simply, Plaintiffs allege that ExxonMobil's conduct amounts to polluting California's environment and waterways—including "navigable waters"—through its production of plastic resin ("virgin polymers") and allegedly "misleading" statements. Compl. ¶¶ 7, 53, 233, 236.

63.    At the second step, taking an appropriately generalized view of this alleged conduct, ExxonMobil's alleged pollution of California's waterways is also sufficiently "related to activity traditionally subject to admiralty law" to justify admiralty jurisdiction. *Gruver*, 489 F.3d at 983. Courts have long held that "pollution in navigable waters" constitutes a "maritime tort." *United States v. City of Redwood City*, 640 F.2d 963, 969 (9th Cir. 1981) (oil pollution) (collecting cases); *In re Exxon Valdez*, 767 F. Supp. 1509, 1512 (D. Alaska 1991) ("Oil spills from vessels on navigable waters have consistently been held to be maritime torts by other courts." (collecting cases)); *Puerto Rico v. The M/V EMILY S.*, 1998 WL 938585, at *1 (D.P.R. July 28, 1998) (same); *In re Oswego Barge Corp.*, 664 F.2d 327, 334 (2d Cir. 1981); *Kohlasch v. New York State Thruway Auth.*, 460 F. Supp. 956, 962 (S.D.N.Y. 1978) (allegations that "drain" constructed by transit authority caused polluting "discharge" into navigable water supported admiralty jurisdiction). In other words, alleged pollution of navigable water, like Plaintiffs allege here, constitutes "activity traditionally subject to admiralty law [such] that the reasons for applying special admiralty rules would apply ...." *Gruver*, 489 F.3d at 983; *Blue Water*, 786 F. App'x at 704-05. Those "specialized rules and technical concepts" apply no less to the marine plastic pollution Plaintiffs allege than to oil pollution (for example) to the same navigable waters. Plaintiffs' navigable-water-pollution allegations thus connect substantially to the traditional maritime activity for jurisdictional purposes.

64.    ExxonMobil's alleged conduct also includes manufacturing and selling too much plastic. Compl. ¶¶ 3, 14, 15, 33, 106-09. According to Plaintiffs, ExxonMobil's plastic production has led to "continue[d] ... export[ation]" of "recyclable materials ..., most to unknown destinations." Compl. ¶ 72. Plaintiffs further allege that over-production of plastic has

caused harm to boat-navigation when, for example, "plastic pollution … gets lodged, trapped, or tangled in Baykeeper's boat's propellers."  Compl. ¶ 193.

65.     This conduct, too, bears a substantial connection to traditional maritime activity—including shipping, boating, and fishing on maritime vessels.  *See Mission Bay*, 570 F.3d at 1130 ("operation of a vessel in navigable waters"); *Blue Water*, 786 F. App'x at 704 ("Although the case law often associates traditional maritime activity with activity involving vessels, neither 28 U.S.C. § 1333 nor the maritime nexus test expressly require the involvement of a vessel.").

### D.    This Court Has Original Jurisdiction Under Section 1331

66.     Section 1331 provides "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"—that is, "when a federal question appears on the face of the complaint."  *Whyte Monkee Prods. LLC v. Netflix, Inc.*, 2024 WL 1645455, at *2 (N.D. Cal. Apr. 16, 2024).  Here, the federal enclave doctrine provides "arising under" federal question jurisdiction over Plaintiff's claims.

67.     **Federal enclave jurisdiction.**  "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).  "[F]ederal law applies in federal enclaves," and "[c]ourts have interpreted this principle to mean that unless an exception applies, any conduct on a federal enclave is governed by federal law."  *Burnes v. Parks at Monterey Bay*, 713 F. Supp. 3d 616, 620 (N.D. Cal. 2024); U.S. Const. art. I, § 8, cl. 17 ("Congress shall have Power ... [t]o exercise exclusive Legislation ... [and] like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.").

68.     For federal enclave jurisdiction, "[a] claim must allege that an injury occurred on a federal enclave or that an injury stemmed from conduct on a federal enclave," and "the connection between injuries and conduct must not be too attenuated and remote."  *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022).  Thus, if tortious conduct caused injury that "occurred on" a federal enclave, then "enclave jurisdiction is proper."  *Willis v. Craig*, 555 F.2d 724, 726 (9th Cir. 1977); *see also Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D.

Tex. May 30, 2014) ("key factor" for federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose."); *Bell v. Arvin Meritor, Inc.*, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) ("Personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction."). As long as "at least some of the[] locations" where the tortious harm occurred are "federal enclaves," that suffices to support federal question jurisdiction. *Bell*, 2012 WL 1110001, at *2.

69.    A federal enclave "is created when a state cedes jurisdiction over land within its borders to the federal government and Congress accepts that cession. These enclaves include numerous military bases, federal facilities, and even some national forests and parks." *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012); *Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (same). "The central principle of federal enclave doctrine is that Congress has exclusive legislative authority over these enclaves." *Allison*, 689 F.3d at 1237.

70.    Here, the situs of much of the alleged harm is California's "waterways" and "coasts"—including in and along bays and the Pacific "ocean," *id.* ¶¶ 151, 154, 211-12, 231, 235, 237.

71.    And abutting those "waterways" and "coasts" are a litany of federal enclaves within California: the Presidio in San Francisco, the Golden Gate National Recreation Area, Naval Air Station North Island, Point Mugu Naval Air Weapons Station, Camp Pendleton, Vandenberg Air Force Base, and numerous other federal facilities and national park areas. *See, e.g.*, *Totah v. Bies*, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (claim arose in Presidio in San Francisco, a federal enclave); *Azhocar*, 2013 WL 2177784, at *1 ("[Federal] enclaves include 'numerous military bases'"). The Complaint, for example, alleges the Monterey Bay National Marine Sanctuary as the situs of harm—waters designated for special protection by the U.S. Secretary of Commerce under the National Marine Sanctuaries Act, 16 U.S.C. § 1431 *et seq.* Compl. ¶ 151.

72.     Plaintiffs' claims thus inherently arose on numerous federal enclaves across California.  And Plaintiffs' "[f]ailure to indicate the federal enclave status and location of the exposure will not shield [it] from the consequences of this federal enclave status." *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992).  Plaintiffs' claims arise under federal law.

**E.     This Court Has Removal Jurisdiction Under Section 1442**

73.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  Courts give Section 1442 "a generous and liberal construction, interpreting the statute broadly in favor of removal." *DeFiore v. SOC, LLC*, 85 F.4th 546, 553 (9th Cir. 2023).  The purpose of the statute is to "protect[] the government's agents." *Id*. at 555.

74.     A party seeking removal under section 1442 must show that: (1) it is a "person" within the meaning of the statute; (2) plaintiff's claims are "for or relating to" an act under color of federal office (i.e, "causal nexus"); and (3) it raises a colorable federal defense.  *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Philadelphia*"); *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017).

75.     All three elements are satisfied.

**1.     ExxonMobil Is A "Person"**

76.     ExxonMobil is a corporation (Compl. ¶ 33), and a corporation is a "person" within the meaning of Section 1442. *See Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.4 (9th Cir. 2014).

**2.     Plaintiffs' Claims Relate To An Act Under Color Of Federal Office**

77.     The second element of jurisdiction under Section 1442 asks whether the claims against a private person relate to conduct "fall[ing] within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007). That requires the removing party to establish a "causal nexus" to actions performed "under federal officers." *Goncalves*, 865 F.3d at 1244.  The "causal nexus" test thus has two components: (1) "actions under" a federal officer and (2) that are "causally connected"—that is,

- 18 -

"relate to"—plaintiff's claims. *Id.*; *Philadelphia*, 790 F.3d at 472. Both components are satisfied here.

78.    First, ExxonMobil "acted under" a federal officer because the government exerted the requisite "subjection, guidance, or control" over ExxonMobil's actions as a wartime synthetic rubber producer, and because ExxonMobil engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Goncalves*, 865 F.3d at 1244; *Watson*, 551 U.S. at 152.

79.    Second, assuming the truth of Plaintiffs' allegations, ExxonMobil's alleged actions, taken under a federal officer's direction, sufficiently connect and relate to Plaintiffs' claims arising out of plastic pollution. *Goncalves*, 865 F.3d at 1245. As described in more detail below, the synthetic rubber industry was developed under the control and direction of the federal government during World War II. Pursuant to that control and direction and as an agent for the federal government, ExxonMobil's predecessor companies constructed and operated butyl and butadiene plants that manufactured chemical compounds used to make tires (and other products) for the war effort. This lawsuit targets all manner of plastic waste, and synthetic rubber (including tires) are considered a source of, and contributor to, alleged plastic pollution. And such tires were used in various military and other applications in California during World War II in the environment within and outside of California, thus connecting sufficiently to actions taken under a federal officer's direction.

### a. ExxonMobil "acted under" federal officials as a participant in the synthetic rubber industry.

80.    ExxonMobil "acted under" federal officials for Section 1442 purposes as a participant in wartime synthetic-rubber manufacturing.

81.    The Supreme Court has emphasized that Section 1442 must be "liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Watson*, 551 U.S. at 147. "For a private entity to be 'acting under' a federal officer, the private entity must be involved in 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Goncalves*, 865 F.3d at 1245. The relationship typically involves subjection, guidance, or control, but it must

go beyond simply complying with the law, even if the laws are highly detailed and thus leave the entity highly regulated." *Id.*

82.    ExxonMobil's World War II participation in the synthetic rubber industry occurred at the "subjection, guidance, or control" of the government. *Id.*

83.    **Government Control of Synthetic Rubber Industry During WWII.**  "Synthetic rubber was … critical to the war effort.  After Pearl Harbor, the United States was cut off from 90 percent of the world's natural rubber supplies.  The government designated rubber as a critical and strategic material, creating the U.S. Rubber Reserve Company to draw on industry expertise to develop synthetic rubber production." *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 496 (S.D. Texas 2015).

84.    Under the direction and control of the federal government during the war years, the synthetic rubber industry developed exponentially faster than it could have in the hands of private industry alone.  During the war, the United States' supply of synthetic rubber increased a hundredfold, from 8,383 long tons in 1941 to 830,780 long tons in 1945. Ex. 1 at 52.[6]  In 1941, 99% of the rubber consumed in the United States was natural, whereas only 1% was from synthetic sources; by 1945, however, 15% of the rubber was natural, whereas 85% was from synthetic sources.  Ex. 2 at 8.

85.    As the United States Attorney General found:  "From a meager production of 8,000 long tons of synthetic rubber in 1941, the fledgling industry had grown, by the end of 1944, to an industrial mechanism capable of producing more than a million long tons of rubber annually.  In the short span of three years the Government, under the stress of a war emergency, lifted synthetic rubber technology from the test tube of the laboratory and transformed it into a full-blown industry.  This transition from laboratory to commercial production was an industrial and scientific achievement, the result of the joint efforts of Government and private industry.  Under normal circumstances this transition would probably have required several decades or more to accomplish."  Ex. 3 at 1.

---

[6] Citations to "Ex." refer to exhibits to the concurrently filed declaration of Dawn Sestito.

86.     The President designated rubber as a strategic and critical material on June 28, 1940.  The Reconstruction Finance Corporation ("RFC"), a financial institution established under the Reconstruction Finance Corporation Act of 1932, formed the Rubber Reserve Company ("RRC") on the same day.[7]  The RRC's "original purpose" was to:

> [B]uy and accumulate a stockpile of natural rubber as a safeguard against possible war in the Far East.  The later activities of Rubber Reserve Company…[were] predominantly concerned with the Government's synthetic rubber program.  These activities [were] of a unique character in comparison with activities of other Government agencies and even other RFC corporations in that Rubber Reserve Company [had] the direct responsibility for the formulation, correlation and operation of a program enveloping a new industry of great magnitude from the date of its inception.

Ex. 7 at 5; Ex. 1 at 9; Ex. 6.

87.     In order to address the rubber shortage, on August 6, 1942, President Roosevelt appointed a Rubber Survey Committee (also known as the Baruch Committee, after its chairman Bernard Baruch) to investigate.  On September 10, 1942, the Committee issued a report that characterized rubber, among "all critical and strategic materials," as:

> ***the one which presents the greatest threat to the safety of our nation and the success of the Allied cause***.  Production of steel, copper, aluminum, alloys or aviation gasoline may be inadequate to prosecute the war as rapidly and effectively as we could wish, but at the worst we still are assured of sufficient supplies of these items to operate our armed forces on a very powerful scale.  But if we fail to secure quickly a large new rubber supply our war effort and our domestic economy both will collapse. ***Thus the rubber situation gives rise to our most critical problem***.

Ex. 8 at 23.

88.     The Committee's report further noted that the United States' current rubber situation was "so dangerous that unless corrective measures are taken immediately this country

---

[7] The RFC was an independent federal agency whose wartime mission included: to "engage in financing of plant conversion and construction, to acquire and construct and to own and operate war plant facilities, to make subsidy payments, [and] to deal in and to stockpile strategic and critical materials."  Ex. 4 at 3, 18, 30.  To effectuate this mission, the RFC created a number of subsidiary corporations, including, but not limited to the RRC, which managed the country's synthetic rubber program, and the Defense Plant Corporation (DPC), which constructed and equipped new industrial plants and/or expanded or converted existing plants to war production.  Ex. 5; Ex. 6.

will face both a military and a civilian collapse." Accordingly, the Committee recommended that the government's "first duty" should be the "maintenance of a rubber reserve that will keep our armed forces fighting and our essential civilian wheels turning. This can best be done by 'bulling through' the present gigantic synthetic program and by safeguarding jealously every ounce of rubber in the country." Ex. 8 at 5-6.

89.     The Committee also recommended that President Roosevelt create an Office of the Rubber Director within the War Production Board (WPB) and grant the office the authority to control all aspects of the rubber program. Ex. 8 at 6. On September 17, 1942, President Roosevelt enacted this recommendation by issuing Executive Order 9246, which created the Office of Rubber Director, and which "authorized and directed" the Chairman of the WPB " to assume full responsibility for and control over the Nation's rubber program in all of its phases, including, but not limited to: technical research and development, importation, purchase, sale, acquisition, storage, transportation, provision of facilities, conservation, production, manufacturing, processing, marketing, distribution, and use of natural and synthetic rubber, related materials, and products manufactured therefrom."[8]

90.     The Office of the Rubber Director existed for two years. By July 1944, the United States' synthetic rubber program was deemed to be fully operational and providing an ample supply of rubber.

91.     During the war, the federal government constructed and owned 51 plants involved in the synthetic rubber program. Ex. 9. As noted by the RRC, these plants were constructed "under the auspices" of the federal government's Defense Plant Corporation and "at the request" of the RRC. Ex. 7 at 47. The government's construction of the 51 government-owned synthetic rubber plants represented a "capital outlay by the Government of almost $700 million." Ex. 3 at 1.

92.     Following the war, the United States began the process of selling the government-owned rubber plants to private industry, while simultaneously insuring that they continued to

---

[8] Executive Order 9246, "Providing for the Coordination and Control of the Rubber Program," 7 Fed. Reg. 7379 (September 19, 1942).

produce sufficient synthetic rubber for military and civilian needs.  Many plans were proposed to dispose of the government-owned plants.  Ultimately, in August 1953, President Eisenhower signed into law the Rubber Producing Facilities Disposal Act of 1953.  This law required that government to obtain full fair value for the plants while providing both for national security and a competitive synthetic rubber market.  Sale of the plants was completed in April and May 1955.

93.    **Wartime Synthetic Rubber Program Operations and Production.**  The RRC determined around 1941 that five major types of plants for the production of buna-S, butadiene, styrene, butyl, and neoprene were required.  Of these types, the largest ones (by volume) were ***butadiene and butyl rubber***, including:

- **GR-S**.  ("Government Rubber-Styrene).  Synthetic rubber of the butadiene-styrene-copolymer type.
  - o   GR-S rubber was also known by its German name (Buna-S) and was a general purpose rubber used in the manufacture of tires.
- **GR-I** ("Government Rubber-Isobutylene).  Synthetic rubber of butyl rubber type.
- **GR-M** ("Government Rubber-Monovinylacetylene).  Synthetic rubber of the neoprene type.
- **GR-A** ("Government Rubber-Acrylonitrile).  Synthetic rubber of the butadiene-acrylonitirle-copolymer type.
- **GR-P** ("Government Rubber-Polysulfide).  Synthetic rubber of the polysulfide type

Ex. 7 at 48; Ex. 3 at 1.

**Synthetic Rubber Production in Government-Owned Plants, 1942-1945**

| Synthetic Rubber Type | Annual Production in Tons | | | |
|---|---|---|---|---|
| | 1942 | 1943 | 1944 | 1945 |
| GR-S (Butadiene-Styrene) | 2,241 | 181,470 | 668,879 | 717,688 |
| | | | | |
| GR-I (Butyl) | 0 | 1,781 | 18,890 | 47,868 |
| GR-M (Neoprene) | 1,350 | 24,611 | 47,302 | 36,332 |
| GR-A (Acrylonitrile) | 0 | 0 | 2,060 | 33 |
| GR-P (Polysulfide) | 8 | 750 | 0 | 0 |
| **Annual Totals** | **3,599** | **208,612** | **737,131** | **801,921** |

Ex. 1 at 51.

94.    **GR-S Rubber (Butadiene).**  Butadiene was the most critical raw material in Buna S [GR-S] rubber, which was made from the copolymerization of butadiene and styrene and was the most common general use synthetic rubber of World War II.  Thus, one of the RRC's chief wartime goals was to secure adequate supplies of both butadiene and styrene.  To meet demand for GR-S rubber and butadiene, the federal government constructed 15 GR-S plants during World War II, including GR-S facilities at the Baton Rouge and Baytown refineries (discussed below).  *See* Ex. 7 at 23-25.

95.    **GR-I Rubber (Butyl Rubber)**.  Butyl rubber, known during World War II as GR-I (Government Rubber-Isobutylene), is manufactured from two petroleum products: isobutylene and isoprene.  During World War II, butyl rubber was used for "exclusive military uses" and essential civilian requirements, including tire inner tubes, gas masks, and barrage balloons (large balloons used to deter enemy airplanes) for the war effort.  In July 1945, the RRC estimated that approximately two-thirds of the total domestic consumption of butyl rubber was for military purposes.  *See* Ex. 10.

96.    At first, no butyl plants existed; butyl and the other chemicals were not yet commercially available.  In order to achieve necessary wartime production of butyl rubber, the federal government thus constructed two government-owned butyl plants at refineries operated by ExxonMobil predecessor entities: the Standard Oil of Louisiana ("SOLA") refinery in Baton Rouge, Louisiana, and (2) the Humble Oil and Refining Company ("Humble") refinery in Baytown, Texas, and purchased the entirety of the output from these plants.  Ex. 3 at 21.

97.    These were the only two butyl plants in the United States during World War II.  The federal government also constructed and then owned and controlled several butadiene and other chemical plants (at Baytown and Baton Rouge (operated by ExxonMobil predecessors) and elsewhere) to allow the production of synthetic rubber.  Ex. 3 at 21.  Butyl and butadiene were used to make tires, among other things.

98.    **The Role of Baytown Facility**.  On May 18, 1942, Humble contracted as agent for the DPC (an RFC subsidiary corporation) to construct a synthetic rubber plant to produce butyl

- 24 -

rubber. Ex. 11. The 58-acre property on which the plant was constructed was located adjacent to the Baytown refinery and was owned by the government. Ex. 12. This plant was operated by Humble Oil as a lessee of the DPC to produce butyl rubber. Ex. 11. Initial production began on September 9, 1944. The plant remained in operation throughout WWII and the Korean Conflict and was sold by the government to Humble Oil on April 28, 1955. It produced hundreds of thousands of long tons of butyl rubber during the period of federal government ownership. The butadiene plant was similarly constructed and owned by the government.

99.    The federal government had day-to-day involvement in operational decisions. For example, in January 1946, Humble submitted a post-WWII request to the RRC to grant Humble authorization to install a pump and tank truck loading facilities at the butyl rubber plant. The pump and facilities requested by Humble replaced a manual skimming operation and was estimated to cost $1,700. The RRC ultimately approved the request. Ex. 13.

100.    In July 1947, Humble requested authorization to construct a concrete drainage ditch near the ammonia compressor at the butadiene plant, for $1100. Humble stated that: "Prior to the installation of this drainage trench, the area adjacent to and north of the ammonia compressor house was inadequately drained and stayed continually wet … It was particularly undesirable since daily washing of the compressor house floor left an accumulation of oily scum along the north side of the building…. Through the use of the concrete trench and a high pressure water hose, the compressor house floor washdown is now routed into a nearby manhole…. This work was tentatively estimated to cost less than $1000 and the work was performed with local approval on Mechanical Order No. 615." Ex. 12.

101.    **The Role of Baton Rouge Facility**. At the SOLA refinery in Baton Rouge, the government-constructed and government-owned butyl rubber plant was known as Plancor 572 (also known as RuR SR-15). This plant was operated by SOLA as a lessee of the government and produced hundreds of thousands of long tons of butyl rubber during the period of federal government ownership. In April 1955, the facility was sold to Esso Standard Oil Company. Ex. 3 at 5, 23-24. The butadiene plant was similarly constructed and owned by the government.

102.    Again, the federal government had operational control and oversight.  For example, in April 1947, SOLA requested authorization to construct a "General Separator."  This proposal was based on plans prepared in 1946 to replace the temporary separator at the outlet of the 72-inch sewer serving Plancor 572 and the other plants in the Chemical Products area.  Ex. 14.  The 1947 request was denied by the RRC.  Approval by the federal government to construct a "new separator at the outlet of the sewer from the Butyl Rubber Plant" was ultimately received by September 1949 and construction of the unit commenced.  Ex. 15.

103.    Indeed, a federal court has already made factual findings regarding the level of control at these synthetic rubber plants.  That court recounted the following background: "Synthetic rubber was also critical to the defense effort.  After Pearl Harbor, the United States lost access to Southeast Asia's natural rubber sources.  President Roosevelt designated synthetic rubber as a strategic and critical war material on June 28, 1940.  The federal government created the Rubber Reserve Company as a subsidiary of the Defense Supplies Corporation to provide synthetic rubber for military and civilian requirements.  The Rubber Reserve Company had the authority to oversee the operation of synthetic-rubber plants owned by the Defense Supplies Corporation to produce synthetic rubber for national defense purposes.  Unlike the Baytown and Baton Rouge [petroleum] refineries, which were owned by Humble and Standard Oil respectively, these chemical plants, or 'plancors' were owned by the federal government." *Exxon Mobil Corp. vs. United States*, 2020 WL 5573048 at *6, 14 (S.D. Texas Sept. 16, 2020).  *See also* Ex. 1 at 9.

104.    The court found that "a federal network of agencies was created or adapted to coordinate the manufacture of war materials and their distribution to meet America's military needs around the world.  These agencies exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials.  The government controlled access to the raw materials needed to run a petroleum refinery.  The government used its authority to control access to the raw materials to help ensure that companies like Humble and Standard Oil entered into contracts to produce avgas, rubber, and

other products. The government also used that authority to control many aspects of the refining process and operations." *Exxon Mobil*, 2020 WL 5573048 at *6.

105. In addition, the court found that the federal government's control and oversight over the synthetic rubber plants (as distinct from general refinery operations) was such that it qualified as a prior operator of those synthetic rubber plants for purposes of CERCLA. The court noted that ExxonMobil's predecessors at both Baytown and Baton Rouge had to "obtain government approval for, among other things, any plant-related expenditure exceeding $1000; the disposal of waste, scrap, byproducts, and surplus materials and equipment; additions or alterations to the plants; and increasing employee salaries and benefits." *Exxon Mobil*, 108 F. Supp. 3d at 531. In addition, a "government official was also permanently stationed at one of the Baytown plants." *Id*. The court quoted a communication from that government official to Humble to show the level of control he exerted: "On numerous occasions I sit in my office looking out of the window along about a quarter to five and can see the men gathering up through the aisles of the boiler house section and lining up to make a rush for the time clocks at five o'clock. Since this matter has not just occasionally happened, but has been constant for weeks, it is running into a considerable loss of time.... Please take steps with the general contractor to see that the condition is eliminated or the matter will have to be taken up with Washington, where I am sure we can get results." *Id*. The court found the official "played a substantial role in overseeing day-to-day operations." *Id*.

106. **Government Subjection, Guidance or Control Over ExxonMobil.** ExxonMobil's federally-owned plants were subject to federal production and operational control requirements. The creation of an entire industry at the direction of the federal government, the lack of commercial availability of the products otherwise, and the federal government's oversight makes this more than an "arm's-length business relationship" between industry and the government. *San Mateo*, 32 F.4th at 758. The "acted under" component of the causal nexus element is satisfied.

1

2

**b. ExxonMobil's acts under color of federal officer relate to claims in the litigation**

3     107.    The second component of the "causal nexus" element—the relation between the

4    ExxonMobil's government-directed acts and Plaintiffs' claims—is also satisfied here.

5     108.    "[T]he hurdle erected by th[at] [second] causal-connection requirement is quite

6    low." *Goncalves*, 865 F.3d at 1244.  It requires "only that the challenged acts occurred because

7    of what [ExxonMobil] [was] asked to do by the Government," *id.* at 1245—that is, that "the acts

8    complained of [simply] 'relate to' acts taken under color of federal office." *Philadelphia*, 790

9    F.3d at 472.

10     109.    **Nexus to Wartime Butyl and Butadiene.**  Here, Plaintiffs' claims "relate to"

11    ExxonMobil's synthetic rubber manufacturing through the nexus of alleged plastic pollution.

12     110.    The synthetic rubber industry was created under the control of the federal

13    government during World War II, advancing the state of the industry by decades.  The synthetic

14    rubber industry likely would not exist as we know it without federal government control during

15    the 1940s and 1950s.  And ExxonMobil (through its predecessors) was a participant in the

16    government-controlled and directed growth of that industry.

17     111.    Butyl and butadiene were used to make tires, among other products, for the war

18    effort.  The only source for butyl in the United States was the government-owned and operated

19    facilities described above at Baytown and Baton Rouge; the federal government purchased all the

20    butyl manufactured at both locations.  Butadiene was manufactured at Baytown and Baton Rouge,

21    but also at other facilities in the United States.  Ex. 1 at 26.

22     112.    After the attack on Pearl Harbor, the United States entered the war and California

23    became an important base for military operations.[9]  California was home to at least 31 major

24    military installations, and many minor ones, from 1939 to 1945.  And at all of those facilities,

25    officers, enlisted men, and civilian employees drove jeeps, trucks, and other military vehicles.

26

27   [9] Stephen D. Mikesell, *The History and Historic Resources of the Military in California*, *1769-1989*, *Vol. II* (March 2000), *available at* https://www.denix.osd.mil/cr/denix-

28   files/sites/19/2016/02/09_California-Historic-Military-Buildings-and-Structures-Inventory-Volume-2.pdf.

The U.S. Navy turned Yosemite National Park's Ahwahnee Hotel into a temporary rehabilitation hospital, and that remote facility had 14 total vehicles: six large trucks, two pick-up trucks, two ambulances, two buses, a sedan, and a shore-patrol wagon.[10]  The Army Corps of Engineers lists at least 25 motor pool, vehicle maintenance, and vehicle storage buildings constructed at California military bases between 1939 and 1945.[11]  The Corps also estimates that "the World War II effort left behind hundreds of thousands of buildings in California."[12]

113.    Because ExxonMobil predecessors were the only source of butyl and a source of butadiene, any tires made with those components during World War II included butyl from Baytown or Baton Rouge and may also have included butadiene from those two locations.  And if the butadiene was not from Baytown or Baton Rouge, it would have come from a different government constructed and owned facility within the United States.

114.    Now, Plaintiffs' lawsuit seeks to hold ExxonMobil liable for harms caused by "ubiquitous plastic pollution," and its "impacts" on "waterways, costs, and oceans everywhere."  Compl. ¶¶ 152, 154.  The scope of the alleged ubiquitous plastic-pollution "crisis" encompasses not only "single-use plastic," but also other "plastic waste," which might end up in "landfills" or as feedstock for ExxonMobil's "ExxtendTM 'advanced' recycling process"—including synthetic rubber tires.  Compl. ¶¶ 117, 142.  Notably, California regulates and manages waste tires within the state.  https://calrecycle.ca.gov/tires/.  And any waste from synthetic rubber tires exists in part due to the government-directed wartime synthetic-rubber manufacturing industry, and the technological innovations it pushed forward.

115.    In addition, Plaintiffs seek "abatement," which could involve the cleanup (or an abatement fund to pay for the cleanup) of plastic pollution including from the synthetic rubber

---

[10] *History of the United States Naval Special Hospital, Yosemite National Park*, available at https://digirepo.nlm.nih.gov/ext/dw/101606073/PDF/101606073.pdf.

[11] Stephen D. Mikesell, *The History and Historic Resources of the Military in California, 1769-1989, Vol. IV* (March 2000), *available at* https://www.denix.osd.mil/cr/denix-files/sites/19/2016/02/11_California-Historic-Military-Buildings-and-Structures-Inventory-Appendices.pdf.

[12] Stephen D. Mikesell, *The History and Historic Resources of the Military in California, 1769-1989, Vol. II* (March 2000), *available at* https://www.denix.osd.mil/cr/denix-files/sites/19/2016/02/09_California-Historic-Military-Buildings-and-Structures-Inventory-Volume-2.pdf.

created at the direction of the federal government during World War II (whether from Baytown or Baton Rouge or elsewhere).[13]  Compl. ¶ 240.

116.    The Complaint passes the "quite low" bar for the required causal nexus to ExxonMobil's past acts taken under color of federal office.  *Goncalves*, 865 F.3d at 1244. Plaintiffs' allegations about plastic pollution, which encompasses such pollution from synthetic-rubber waste tires, sufficiently "relate[] to" ExxonMobil's acts under the government developing, scaling, and manufacturing that very same synthetic rubber.

### 3.    ExxonMobil Raises A Colorable Federal Defense

117.    The last element of Section 1442 jurisdiction requires ExxonMobil to assert a "colorable federal defense."  *DeFiore v. SOC LLC*, 85 F.4th 546, 558 (9th Cir. 2023). ExxonMobil satisfies this element with a federal contractor immunity defense.

118.    Colorability under Section 1442 is not a high bar; it does not turn on "whether [the] defense will be successful," and "[d]efendants need not win their case before removal."  *Id.*; *Stirling v. Minasian*, 955 F.3d 795, 801 (9th Cir. 2020) ("We do not express a view on whether this defense is 'in fact meritorious'; we hold only that it is 'colorable.'").  Accordingly, "[i]n construing the colorable federal defense requirement," the Supreme Court has long "rejected a narrow, grudging interpretation of the statute."  *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999).  "And a removing defendant need not have a colorable federal defense for every claim; one colorable federal defense against one asserted claim is enough."  *DeFiore*, 85 F.4th at 558. "The purpose of this requirement is to supply a federal element under which the defense to the action arises."  *Id.*  Finally, in addition to colorability, the federal defense must also "aris[e] out of [defendant's] official duties."  *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981).

119.    In addition to general federal defenses, including First Amendment protection and federal preemption, *see, e.g.*, *Stirling*, 955 F.3d at 801 (preemption), ExxonMobil has a colorable federal defense against Plaintiffs' claims, including nuisance, under federal contractor immunity.

---

[13] ExxonMobil does not concede and actively disputes that it could have liability for such conduct or that it could be required to abate or fund an abatement plan as alleged in the Complaint.

120.     The federal-contractor defense bars "civil liabilities arising out of the performance of federal procurement contracts." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506 (1988).  The defense "broadly applies to any product supplied for government use so long as it conformed to the government's reasonably precise specifications." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 946 (7th Cir. 2020).  "That is all that the defense requires when it comes to the nature or quality of the goods." *Id.*

121.     Accordingly, in *Baker*, where a defendant's predecessor operated a "refinery" that made "materials [that] were critical wartime commodities because they were necessary to make essential military and civilian goods," the defendant had a colorable federal contractor defense to soil pollution claims relating to those refinery operations. *Baker*, 962 F.3d at 940.  The fact that production occurred according to "according to detailed federal specifications" colorably immunized the defendants under the federal contractor doctrine. *Id.* at 940, 946-47.

122.     Here, too, ExxonMobil (through its predecessors) operated government-owned plants and produced synthetic rubber "product[s] [that] went directly to the United States military to support its efforts in World War II," *see supra* at ¶¶ 96, 111, *Baker*, 962 F.3d at 946 (colorable defenses where even just "at least some of ISR's production went directly to the United States military"); Ex. 10.

123.     And synthetic rubber production occurred according to "detailed federal specifications," *Baker*, 962 F.3d at 944, as the government and its contractors worked in concert to "lift[] synthetic rubber technology from the test tube of the laboratory and transformed it into a full-blown industry." Ex. 3 at 1; *see also* Ex. 1 at 26-27.

124.     Indeed, "the government here all but nationalized [synthetic rubber production] during World War II." *Baker*, 962 F.3d at 947.  That supports a colorable federal defense against Plaintiff's claims arising out of ExxonMobil's conduct at the direction of the government.

## V.     CONCLUSION

125.     Because this case is removable pursuant to 28 U.S.C. §§ 1331, 1332, 1333, 1441 and 1442, further proceedings in the Superior Court of the State of California for the County of

1   San Francisco should be discontinued, and the action should be removed to the United States

2   District Court for the Northern District of California.

3       126.    Counsel for ExxonMobil certifies that a copy of the original Notice of Removal

4   was already filed with the Clerk of the Superior Court of the State of California for the County of

5   San Francisco, as required by 28 U.S.C. § 1446(d), on October 18, 2024.

6       127.    ExxonMobil reserves the right to amend or supplement this Notice of Removal,

7   and reserves all rights and defenses, including those available under Federal Rule of Civil

8   Procedure 12.  By removing this action, ExxonMobil neither waives any defenses otherwise

9   available to it, nor admits any of the allegations in Plaintiffs' Complaint.

10

11  Dated:  November 8, 2024                    O'MELVENY & MYERS LLP

12

13                                             By:    /s/ Dawn Sestito
                                                      Dawn Sestito
14

15                                             DAWN SESTITO (S.B. #214011)
                                               MATTHEW R. COWAN (S.B. #281114)
16                                             O'MELVENY & MYERS LLP
                                               400 South Hope Street, 18th Floor
17                                             Los Angeles, CA 90071-2899
                                               United States
18                                             Telephone:   (213) 430-6000
                                               Facsimile:   (213) 430-6407
19                                             dsestito@omm.com
                                               mcowan@omm.com
20
                                               KIMBERLY BRANSCOME (S.B. #255480)
21                                             PAUL, WEISS, RIFKIND, WHARTON &
                                               GARRISON LLP
22                                             2029 Century Park East, Suite 2000
                                               Los Angeles, CA 90067-3006
23                                             Telephone:   (310) 982-4350
                                               Facsimile:   (310) 943-1748
24                                             kbranscome@paulweiss.com

25

26

27

28

AMENDED NOTICE OF REMOVAL OF CIVIL ACTION
CASE NO. 3:24-CV-07288-RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, true and correct copies of this AMENDED

NOTICE OF REMOVAL OF CIVIL ACTION were filed with the United States District Court for

the Northern District of California, and served on all counsel of record, via ECF electronic filing.

Dated: November 8, 2024                    Respectfully submitted,

*/s/ Dawn Sestito*
Dawn Sestito