UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| **Sierra Club, Inc., et al,** | ) |
| | ) No. 3:24-cv-07288 |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) San Francisco, |
| **Exxon Mobil Corporation, et al,** | ) California |
| | ) July 17, 2025 |
| | ) 1:53 p.m. |
| Defendants. | ) |

_____

**BEFORE:   THE HONORABLE RICHARD SEEBORG, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS VIA ZOOM VIDEOCONFERENCE</u>**

**<u>MOTION TO DISMISS</u>**

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

(By Zoom Videoconference)

For the Plaintiffs:
    COTCHETT PITRE & MCCARTHY LLP
    By:  **Grace Y. Park, Esq.**
         **Niall Padraic McCarthy, Esq.**
         **Tyson Carl Redenbarger, Esq.**
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010


For the Defendant:
    O'MELVENY & MYERS LLP
    By:  **Dawn Sestito, Esq.**
         **Louis W. Fisher, Esq.**
    400 South Hope Street
    Los Angeles, CA 90071-2899

**P R O C E E D I N G S**

COURTROOM DEPUTY:  24CV7288, Sierra Club versus Exxon Mobil Corporation.  Counsel, could you please come to the podium and state your appearances.

MR. MCCARTHY:  Good afternoon, Your Honor.

Niall McCarthy; Cotchett, Pitre, and McCarthy for the plaintiffs, along with two of my colleagues.

THE COURT:  Good afternoon.

MR. REDENBARGER:  Good afternoon.  Tyson Redenbarger on behalf of Cotchett, Pitre, and McCarthy for the plaintiffs.

THE COURT:  Good afternoon.

MS. PARK:  Good afternoon, Your Honor.  Grace Park on behalf of the nonprofits.

THE COURT:  Good afternoon.

MS. SESTITO:  Good afternoon, Your Honor.  Dawn Sestito, O'Melveny and Myers for defendant Exxon Mobil Corporation.  And at counsel table with me today is Louis Fisher.

THE COURT:  Good afternoon.

So on the calendar is defendant's motion to dismiss and then also a motion to strike.  Let me hear first from the moving party.  We'll start with you, Ms. Sestito.

MS. SESTITO:  Your Honor, do you have a preference? Would you like me to start with the motion to dismiss?

THE COURT:  Why don't you start with nuisance and then do UCL.

MS. SESTITO:  Okay.  So, Your Honor, this is a case that the plaintiffs have described as one about alleged misleading marketing.  And I'll walk through the nuisance cause of action but I do want to point out that in our motion we walked through the statements at issue, explained why we did not believe that they were misleading --

THE COURT:  Is it really fair though -- you've characterized their nuisance claim in a very narrow way, and you keep pointing at, well, it's these statements, that what the case -- the case is, for good or for bad, much broader than that, I understand.  They are contending that your polymer production, you know that it is -- once that gets into products and the products get out in the marketplace, they're not going to be recyclable -- at least to the level suggested -- then you engage in activities to promote the polymer production sale, and then it leads inexorably to that -- those products being purchased and those products then going into the stream of pollution that causes the nuisance.

You may not agree with that, but it's not fair to characterize their case as this is just a misrepresentation claim based on a bunch of different statements.  That's not what their claim is, for good or for bad.

MS. SESTITO:  Okay, Your Honor.  Then let me talk a

little bit about the nuisance law itself because what's clear and, what I think the parties both agree with, is that a nuisance claim can't be -- it's distinct from product liability and failure to warn, and California Law is very clear on that.

THE COURT:  It can be both.

MS. SESTITO:  It can be both.  Sure.  But for it to be a nuisance claim, there has to be something beyond an ordinary product liability claim.  And, here, what they're attacking is the ordinary and intended use of plastics and plastic polymers.

THE COURT:  No.  They're -- no.  They're attacking your suggestion that it -- things can be recycled which can't be recycled which then leads, according to their theory, to the acquisition of these materials, the discarding of these materials, and the pollution.  That's what they're claiming.

MS. SESTITO:  Okay.  So if we focus on that that their allegations are focused on our statements that plastic can be recycled, under the case law, right, Team Enterprises, the Ninth Circuit case that kind of summarizes the California Law says that -- so that came up in a pollution case, but the way they summarized California Law was that you can be liable for nuisance if you affirmatively instruct the polluting entity to dispose of hazardous substances in an improper or unlawful manner or if you manufacture or install a disposal -- the disposal system that leads to that pollution.

And if you go to, for example, Santa Clara -- which

involved unlawful promotion -- so if the allegation here is that we were promoting recycling --

THE COURT:  Santa Clara doesn't say it can only be promotion.

MS. SESTITO:  It doesn't say it can only be promotion. But when it is promotion like it was in Santa Clara, it has to be promotion for some sort of hazardous use.  What made Santa Clara a public nuisance wasn't that the defendant sold lead paint or that they promoted lead point.

It was that they promoted lead paint for interior use and that was a particularly hazardous use of lead paint.  That was the distinction in Santa Clara that allowed that to fall within public nuisance.  And, here, we have no similar allegation of a promotion for hazardous use.

It is hard to imagine that talking about plastics as a recyclable could be considered a promotion for hazardous use given that the State of California, the Federal Government, many government entities also talk about plastics as being recyclable, that recycling bins -- including in this courthouse and at SFO -- say that you can put plastic water bottles in them.

THE COURT:  Their accusation is that you knew it wasn't.  And you're in the business of polymer production, unlike, you know, a public entity saying let's all recycle is entirely different than this.  And, you know, again, you may

quite possibly prevail in terms of undermining the nuisance claim, but we're at the posture right now of just whether or not it can even go forward.

So, you know, the fact that ultimately you think you can show that there's nothing wrong here isn't the analysis that I need to undertake.

MS. SESTITO:  Sure.  But you have to find something that falls within the rubric of public nuisance.  I do want to say that while Exxon Mobil is a polymer manufacturer, they're not a recycler.  They're not in waste management.  It's actually the State and the City and the counties that do all of that and they would have the knowledge about what is and isn't recycled, not --

THE COURT:  But isn't the accusation that you knew when you were taking the posture that you were suggesting that this could be something that is recyclable, you knew it wasn't. Or you knew the degree to which it could be recycled was much less than ultimately it is.  That's the -- I'm not saying that's correct or not correct, but that's the accusation.

MS. SESTITO:  Yeah.  But -- well, I'll get to that in a moment about whether there's actual non-conclusory allegations that support that.

But I think there has to be -- under California Nuisance Law, a -- something that distinguishes this from a product liability claim and something that is beyond -- so in

Santa Clara, in Conagra, it was the promotion of lead paint for interior use.  In Purdue Pharma, which the plaintiffs rely on, that was misleading promotion of opioids with the knowledge that they were abused and diverted for unlawful purposes so you had unlawful use and the promotion for that unlawful use.

The distributors, of course, did not promote the products so they didn't have to show that there was affirmative promotion, but Judge Breyer found that they -- or on that motion at least -- that there was allegations of illegal distribution activity in a manner that fueled and caused the secondary illegal market which caused that unlawful use.  And, in this case, there's no allegations of unlawful use.  I'm not aware of any that there could be.

There's not even an allegation of a hazardous use.  I don't think that recycling could be found to be a hazardous use of the products.  They're not claiming in --

THE COURT:  You keep sort of focusing on recycling.  What's wrong with recycling?  This case isn't about whether or not this is going to the marketplace and saying let's all recycle is actionable.  They're claiming something very different, which is -- of course we all think recycling is wonderful, but you knew that your -- the polymers being produced that went into products was not subject to recycling, at least to the extent that you were suggesting to the world that it was.  And they say then that leads to acquisition of

these products, the products then going into the -- you know, the pollution stream, and there's the nuisance.  That's what they claim.

MS. SESTITO:  Right.

THE COURT:  So when you keep saying, well, what can be wrong with recycling, I agree with you.  Everybody loves recycling.  But that's not what they're claiming.

MS. SESTITO:  Right.  But they have to show that there is some affirmative conduct that leads to something hazardous or unlawful.

THE COURT:  But isn't the affirmative conduct -- that is where we get into some of the representations.  The position, even as I understand it perhaps to this day, on your website making the suggestion -- and you can argue there's no inference there that our products are recyclable -- but their argument is there is that inference there that by you going out there and talking about recycling in the way that you do is planting the suggestion that the products are recyclable when they really aren't.  Then people buy them with that misunderstanding and they toss them away and then we have pollution.

MS. SESTITO:  Well, but I don't -- so, first, the statements by in large, including the current statements, aren't related to particular products.

THE COURT:  Yeah.  But that's, again, an issue that

will be hashed out -- if it gets to that point -- about what is meant or what isn't meant by that, and you'll be free to argue. You know, nobody can infer from this that we're suggesting polymers are ultimately going to go into products that are recyclable.  You can make that argument, but that's, again, I don't think what we're talking about here.

MS. SESTITO:  Yeah.  But I think under public nuisance law, there that has to be something more.  In all of these prior cases, it was either a specific instruction about how to dispose of the chemicals in a dry-cleaning facility.  And when there wasn't a specific instruction, in fact, where there was just a suggestion or a failure to give a proper instruction, that wasn't sufficient under Team Enterprises under Hinds, under Modesto I, that was insufficient.

And Purdue Pharma had the illegal distribution that fueled the illegal, you know, use of opioids.  The lead paint case had the promotion -- I mean the Court calls it promotion for hazardous use which was the promotion of lead paint for interior use.

THE COURT:  What about the Glock case?

MS. SESTITO:  I'm sorry.

THE COURT:  Glock.

MS. SESTITO:  Yeah.  Glock is similar, I think, to Purdue Pharma.  I do think it's questionable whether that remains --

THE COURT:  So you're saying some suggestion is --

MS. SESTITO:  But -- but assuming it is, it's the same thing, which is that there was a promotion of the firearms that lead to an illegal market for those firearms and that Glock had knowledge of that.

Here, there is no illegal use.  And I don't think there's a hazardous use unless you assume that all plastic is hazardous.  And if you assume that all plastic is hazardous -- I mean, that's what they're saying.  That is product liability.

And if -- if promoting a product that a plaintiff thinks is too hazardous to be used, if that alone states a public nuisance claim, that will break this wide open.  I mean, these cases are trying to draw a limit and a demarcation around public nuisance that doesn't allow it to overtake tort law.

And if you look at each of these cases carefully and how the Courts parse the conduct -- and I think it does have to be done now.  You do have to look at what are they saying we did.  And there's a lot of broad allegations that say, you know, that we knew, that we promoted this, we said that.  But if you actually look at the statements -- and I'll step in the causation in a moment -- you know, there is a New York Times publication from many decades ago that says, for example, many plastics can be recycled.

I don't think that is the kind of conduct that under Purdue Pharma -- I mean, Purdue Pharma involved like conduct --

distribution conduct that had been -- the Government had sanctioned the defendants for, found was in violation of their duties.  It was illegal distribution conduct that lead to illegal use of opioids.

Here, the statement is that we said decades ago that many plastics can be recycled.  It's hard to understand how that could possibly be a statement that is for a hazardous use, an unlawful use, an improper use.  And I do think you have to keep in mind that it wasn't tied to a particular product.

All of the other cases are the specific instructions about how to dispose of this chemical that is going to the person you're selling the chemical to.  Or the marketing statements about the specific opioids that Purdue sold or the specific advertising.  If you look at the Conagra decision, the Court of Appeals goes through the specific ads for lead paint, and where those ads don't talk about interior use, they didn't consider them.

But let me talk now about causation because it's similarly hard to imagine how -- and I don't think they've plead this -- how a statement from decades ago in the New York Times that says many plastics can be recycled has led to the plastic pollution that they're claiming exists now in a world in which there are similar and many, many more statements that are coming from the State of California, the counties, the cities, the Federal Government.

When I go up to any recycling bin in this state, they tell you to recycle plastics.  And it is difficult for me to imagine that the reason why someone is putting a plastic water bottle in a recycling bin is because of a statement that was made decades ago -- a statement that's made now about advanced recycling as opposed to the express instructions that are given by the Government entities that put out those recycling bins.

The other point is that it's not clear how a statement that a product or plastics could be recyclable results in more plastic ending up in oceans or beaches or becoming pollution.  And if it is -- and they don't explain that.  They don't --

THE COURT:  Again, I don't want to beat the same drum over and over again.  But is that something that would need to be explained at this stage of litigation?

It ultimately may need to be explained, but the question really is have they articulated a legal theory that can advance that, you know, if they proved everything.  So do they really have to do what you suggest they have to do at this stage?

MS. SESTITO:  Well, I think they have to at least plead allegations that are plausible.

THE COURT:  True.

MS. SESTITO:  Right.  And I don't think they've done that.  Because it's not clear how -- they've not articulated a causal theory as to how telling someone that, let's say a

plastic water bottle is recyclable -- or plastics in general -- and someone assumes that applies to a plastic water bottle. Does that -- I don't think it is plausible to say that that would cause someone to litter that plastic water bottle on the beach.

I don't think it's plausible to suggest if the allegation is that those water bottles are leaking out from the waste management system that that has anything to do with the statements or, frankly, with Exxon Mobil. That would be an issue with the waste management system. And so I think they do have to allege something, especially when there are the more plausible explanation -- well, I guess I don't know the answer as to what their theory of causation is as to how it ends up in the environment.

THE COURT: Isn't it -- isn't it more -- it can even be simpler than that. Isn't it really -- and they'll tell me if I'm wrong -- that they're alleging that through your activities, people are acquiring products, single-use plastics, for example, that under the mistaken notion that you've planted, right -- and I'm saying this is just what they allege -- that that would be subject to recycling. And had you not done that, perhaps those items would not have been purchased and then those items would not then end up in a -- not subject to being recycled, effectively, and polluting the environment.

I mean, isn't that what they're saying?

MS. SESTITO:  Yeah.  But how do they get into the environment?  So if they go --

THE COURT:  Does that matter?  I mean, in other words, they know -- well, they allege that it's certainly foreseeable that by doing what they're doing, they are promoting a process whereby people acquire this and then they discard it and that's pretty foreseeable.  So the fact that they're not doing the discarding or saying -- you're not doing the discarding -- doesn't necessarily defeat their claim.

Do you have to be the discarder here?

MS. SESTITO:  Well, I think the issue is that if you tell someone to recycle and then they put that in a recycling bin -- and I don't understand the mechanism by which that then ends up polluting the environment.

THE COURT:  Aren't they saying the person might not have bought that and then it wouldn't be thrown in the bin, ultimately, because they'd say I don't want something that can't be recycled.

MS. SESTITO:  But how does it end up in the environment causing the pollution?

THE COURT:  Because the party that is discarding is under -- thinks, according their allegations, under the mistaken impression that it is recyclable so they toss it, effectively.

MS. SESTITO:  But into a bin, right, not on to a beach.

THE COURT:  Well -- well, so they have to -- in other words, they have to allege that the discarders are discarding into -- on to the beach?

MS. SESTITO:  Well, and I don't think -- one, I don't know that they can allege that or that that has anything to do with the statements.  And that's similar to the Pepsi case in New York where, you know, the acts of a third-party litterer don't have really anything to do with a statement about whether a product is recyclable.

But I also think, Your Honor, that you do have to go -- I mean, they have a lot of broad allegations about what Exxon Mobil did or didn't do.  But when they get into specifics, if you look at the actual statements, they are few and far between over a very long period of time.  There's not a specific instruction to anyone to do anything.  There is -- with the exception of the Hefty Bags, there is -- it's not even tied to a particular product.

And I do think that you, at this stage, have to look at what they've plead and determine whether that is plausible that that could have caused plastic consumption to change so markedly that it has led to the plastic pollution crisis that they've identified and whether that meets this kind of rigorous standard for public nuisance.  Certainly those statements you

have to look at for purposes of the UCL claim.

THE COURT:  And that's a good segue.

MS. SESTITO:  So the standing issue on the UCL, Your Honor, is really tied into the causation and so it's the same argument which is that it has to be -- they have to have suffered the injury as a result of the business actor practice at issue, and so I don't -- unless you have a questions --

THE COURT:  I thought your principal point of contention on UCL was that it doesn't fit into any of the prongs, the three; and that, you know, we've got the illegal prong, that doesn't work, and I think you've set that out fairly fully.  The fairness prong is always troubling to me because taken to its extreme, it could eat up everything, and so it doesn't really fit here.

And then -- and I'm going to ask them about this -- the fraudulent prong, it doesn't seem to be where they're going with this.  Because if they were, I'd be -- I'll acknowledge I agree it doesn't currently pass the 9(b) issue if they were going in that way, but it doesn't appear they're going in that way.  So I think that was your principal argument.

MS. SESTITO:  It is.  We also had kind of standing -- we had statute of limitations for some of the older statements. I'm happy to address continuing violation if you have questions about that.

THE COURT:  Well, why don't you -- I mean, you

identified it.  They've contended that it's a continuing violation going up to the current day, I think, with respect to statements made in websites and the like.  So why is that not right?

MS. SESTITO:  Well, because you've got a bunch of individual statements that are made over a very long period of time with huge lapses of time between them.  Continuing violation, they don't really explain the basis of why they assert that, but the kind of the -- you know, the paradigmatic example is like a harassment claim where you may not reach severe harassment until there's multiple acts that have occurred.

But, typically, even in those cases, they have to be fairly close in time to be part of the same conduct.  And, here, especially under the UCL, if their allegation is a particular statement was unlawful or misleading or fraudulent, that would have been so at the time that statement was made.  They don't have to wait for there to be multiple to --

THE COURT:  Isn't though the argument that there's a, you know, a cohesive campaign, if you will, and it's reflected at various points in the statements that are being made, but it's an overarching strategy by Exxon and it's not so much these individual statements that are independently actionable.  It's more a continuum of this campaign, if you will.  And that's how I think they're characterizing the continuing

violation concept.

MS. SESTITO:  Yeah.  But I'm not aware of any case that allows you do that under the UCL when each of the statements are allegedly violative on their own.  And I don't -- and where they're separated by many years.  And I think this is where, Your Honor, the fact that they've only alleged I think it's like 12 statements or 12 allegations is actually important because they're alleging things back many decades.

And to have 12 across that time and then allege that that's a campaign of deception, a continuing course of conduct.  And when the statements vary in term terms of the early ones are about waste disposal and whether there's room in landfills and they relate to polystyrene foam, and then later they're about different products and different -- different -- like the early ones weren't about recycling.  There are later ones that are about recycling.  And the newer ones are about advanced recycling.

So the topic, while loosely related, they're not -- they're not closely related.  And they varied over time with huge gaps between them.  So I don't -- the -- I don't think they can just allege generally that there's been a campaign of deception and that that let's them go back in time without alleging plausible facts to support that.  And I don't think that the limited statements -- and especially, Your Honor, if

you look at the content of those statements.  Right.

Some of the statements about polystyrene foam were just that it crushes down smaller than paper.  So what does that have to do with recycling or with advanced recycling?  And how is that misleading or deceptive?

THE COURT:  So that's -- and I don't fault you for doing this -- but that's sort of taking a look at the statements sort of separately in isolation.  Is this a true statement or not a true statement when the overarching claim is that this is all a cohesive campaign designed to do what we've already talked about.  But I think the UCL claim I have got an understanding of what you're going at.

My least favorite is -- because I always -- and I'm not a big fan, I'll acknowledge, of any SLAPP stuff so we can -- we can talk about it, if you would like.

MS. SESTITO:  Well, I mean, we brought it, Your Honor.  So we -- I think our review on anti-SLAPP, I think --

THE COURT:  You're kind of in an interesting position -- ironic position in light of your activities in the Texas Court.  Isn't it?  I mean you're, as I understand it, have brought a defamation claim that's connected to this whole thing.  And it's just a little odd that I now have an anti-SLAPP here and we've got the position you've taken in Texas but --

MS. SESTITO:  Well, I don't think that the Texas

action is relevant.  The Texas action doesn't relate to statements that were made in the complaint and the litigation specifically, Your Honor.

THE COURT:  I'm just commenting on the irony of the postures more than anything else.

MS. SESTITO:  But anti-SLAPP says what it says. Right.

THE COURT:  Indeed.

MS. SESTITO:  And it -- on step one -- I mean, I don't think there's really a dispute that plastics and recycling are public issues -- issues of waste management that those are public -- issues of public concern, they're public issues.  I don't think the plaintiffs seem to really dispute that.

THE COURT:  Right.

MS. SESTITO:  So I think their primary argument on prong one are the exceptions.

THE COURT:  Public interest exception being a big one.

MS. SESTITO:  Yeah.  And I think -- I don't think that they meet the public interest exception under its express terms.  It requires that the relief that they're seeking is brought solely in the public interest.  And if they're seeking any individual relief at all, the cases are clear that that takes it out of that.

And it's clear here, they're seeking relief on behalf of themselves and the public.  Heal the Bay has brought a

private nuisance claim. They're seeking compensatory damages so I don't see how they can meet that prong.

Under controlling case law, they cannot meet that prong. They have a second problem which is that private enforcement isn't necessary because what the Courts look like there is whether or not a public entity has brought a claim seeking to enforce the same rights that plaintiff seeks to vindicate.

THE COURT: And it's the AG action.

MS. SESTITO: Yeah. We know that that has happened. They're the same exact claims. They're also brought on behalf of the general public on behalf of the people of the State of California.

And, again, it -- and when they filed it, they said it was a -- like a -- they were cooperating. It was a partnership to file the claims so there was no need for them to file this. And, again, the exemptions, they bear the burden and they have to be strictly construed.

And do you want me to address commercial speech as well?

THE COURT: I -- no. That's another exemption and that's briefed adequately.

MS. SESTITO: Okay. Yeah.

And to be clear, you know, that has to be looked at on an allegation by allegation basis to determine whether any of

them are commercial speech.  I think it's not really a close call on most of them.

THE COURT:  Okay.  I'll give you another opportunity but let me hear from plaintiffs.

MR. REDENBARGER:  Good afternoon, Your Honor.  Tyson Redenbarger.

I'll be addressing the nuisance cause of action.  Mr. McCarthy will be addressing the UCL cause of action.  And Ms. Park will be addressing the anti-SLAPP issue.

So with respect to the nuisance claim, as Your Honor pointed out, this case is broader than the way that Exxon has interpreted it.  They have looked at certain issues in isolation in order to fit into some of the arguments they want to make, but, frankly, that ignores many allegations in the complaint and is not accurate.  They've done that because they would like the Court to follow the line of cases that deal with product liability.  Cases that involve the simple manufacture of a product and the failure to warn.

Many of the cases they rely on; the Teams case, the Merced case, the Hinds case are all a case just like that where you have a product, a failure to warn.  In many of those cases, there's not even allegations of knowledge of the harmful consequences of these products, and they do that because they want the Court to follow that line of case.  This case has far broader allegations than that.

THE COURT:  But isn't one of your challenges is it's so broad that it -- as your colleague was talking about -- you're alleging that somehow through their conduct, single-use plastics are being acquired and then ultimately they're in a position where they're causing some pollution.  But where -- where is it going?

I mean, is it -- the example she used is if somebody is throwing a single use plastic into a recycle bin thinking it's 100 percent recyclable, and it -- it's not.  But is that -- is that the nuisance or is the nuisance that somebody goes out on a beach and doesn't even bother to try to seek it to be recycled and tosses it on the beach?  I mean what is it?  What is the nuisance?

MR. REDENBARGER:  So I think that point goes to causation.

THE COURT:  Yes.

MR. REDENBARGER:  And I think -- and what we've submitted in the papers -- is the Court should follow the nuisance line of cases.

THE COURT:  The causation to cause what harm?  What I'm trying to -- frankly, what is the nuisance?  Is it that these items are plastics, cause pollution; or is it that people acquire it thinking it's more recyclable than it is and then it gets into the stream and it causes pollution?

It's -- I understand -- I agree with you it's a very

broad claim.  My problem is it's so broad that I can't really get my hands around it.  So why don't you articulate for me exactly what the chain is that causes the ultimate nuisance.

MR. REDENBARGER:  Yes.  So the causation chain here -- we've alleged that Exxon is the world's largest producer of single-use plastics.

THE COURT:  The polymers that go into single-use plastics.

MR. REDENBARGER:  Correct.  And those polymers are then sold to manufacturers.  We've named a few -- Berry's Global, Amcor -- those manufacturers create the top plastic brands in America.  We have Starbucks, Pepsi, Coca-Cola, Nestle, Walmart.

Those products are sold to consumers and those very products are the top pollution that ends up on beaches.  We cited a Surfrider study and audit of actual plastic pollution on the beach so that's the chain right there.

THE COURT:  So are the plastic products the nuisance?

MR. REDENBARGER:  Yes.  The plastic pollution -- as they become pollution.  And the connection between a plastic product and pollution, that's where you bring in the recycling and the landfilling claims.

Exxon engaged in a years-long campaign to tell the public that plastic can be safely disposed of.  That encouraged consumers to buy more of it.  The problem is it's not capable

of being disposed of.

You can't landfill it.  It's dangerous.  It leaks chemicals.  You can't recycle it.

California, for example, doesn't recycle many of the plastics they make.  We've cited several facilities in the Bay Area that just don't accept certain resin types.  Those are single use resins that are just not acceptable.

So what happens is that plastic gets moved around.  It gets transported.  Ultimately, it ends up back in a landfill, shipped overseas, spilled into the environment, and that's how we ended up with this pollution crisis.

THE COURT:  One the points of distinction that Ms. Sestito pointed out to me when she was talking about the Santa Clara case, and she was talking about in that case the nuisance claim was premised on the ultimate hazardous use that it was -- and as she characterized it -- you know, the lead paint -- and it wasn't just lead paint is bad.  It is lead paint shouldn't be used in an interior situation.

In your case, what is the hazardous use?

MR. REDENBARGER:  So hazardous use is not an element.  We do not have to establish there was a hazardous use.

THE COURT:  It's not -- she's saying that's when I'm trying to apply the Santa Clara case, I should look -- it's not so much that's an element.  She's saying that was the factual situation in Santa Clara.  So why is it -- that makes it

distinguishable from our case.  So your answer is, well, that may have been the case in Santa Clara, but you don't need a hazardous use.

MR. REDENBARGER:  No.  A nuisance is anything that's injurious to public enjoyment of property.  Here, it's public pollution.  It's pollution on beaches.  It's plastic pollution crisis.

Santa Clara doesn't say you have to -- and it's very clear and actually Purdue Pharma comments on this -- you do not have to allege promotion for hazardous use.  Nuisance standard is quite broad.  It's anything that is -- that creates a nuisance or assists in the creation of nuisance.

And I think both Santa Clara and Purdue are helpful in that standard when compared to this case as to what qualified as a nuisance.  So in Purdue Pharma, a nuisance was established based on false and deceptive advertising that resulted in greater quantities of opioids being distributed with the knowledge that there was a danger associated with excess prescription drugs in the public's hands.  Those are very similar to the allegations here.

Here, we have a misleading marketing campaign, concealment, hiding of the truths about the dangers of plastics, and the realities of whether or not they can be safely disposed, overproduction, all while Exxon knows that plastics can't be recycled and are harmful when they enter the

environment.

That's very similar to the Santa Clara case.  There the claims were there was a long-running campaign of concealment of the dangers of lead paint.  There was a campaign against regulation of lead paint.

They were promoting lead paint for the use on the inside of a house.  Even though the defendant knew this was dangerous.  They had known this for a long time.

Again, it's very similar to the allegations here. Here, we have a long-running campaign, increased production, hiding of the truth about the dangers and the realities of recycling, all while Exxon knows that it's creating problems when plastic can't be recycled and ends up as pollution.

I'd also like to point quickly to the Purdue Pharma as it relates to causation.  I think that's another example of how this case is very similar to that case.  In Purdue Pharma, the Court found that causation had been adequately alleged based on deceptive marketing, increased usage as a result, the harms were foreseeable, and the extent of the harms would not have occurred without defendant's conduct.

Again, these allegations line up pretty nicely with the claims here.  Here, Exxon is the largest producer of single-use plastics engaged in a decades-long campaign to sell their products, coming up with different ways to tell the public that they could be safely disposed of when they cannot,

that these harms were knowable.  We cited documents going back years to say that recycling isn't feasible and plastic can be harmful when it enters the environment, harmful to humans, plants, animals, etcetera, and we've also alleged the extent of the harm --

THE COURT:  At the end of the day, are you -- on the causation point -- but for the activities of Exxon, you would have less single-use plastics or we would have single-use plastics being treated in a different way?  What would the -- what's the but for their conduct?  What would it lead us to?

MR. REDENBARGER:  It would have less plastics, yes. It would also have less plastic pollution.  But to directly respond --

THE COURT:  And how is that?  Why?

MR. REDENBARGER:  So for one example, California cannot -- California has recycling facilities.  They are capable of handling some plastics.  Small percentages.  We cited those.

They can't handle the glut of plastic that is being poured in due to Exxon's conduct.  And just to respond to their argument, Exxon's argument, they argue that we had no theory whatsoever.  Not that that theory was inaccurate or implausible, it was that there was -- and it's in their papers -- that we had no theory whatsoever.

So I'd like to at least point out that we do have a

theory, that it does involve several steps in a chain.  But as the cases pointed out, we do not, at this stage, have to prove every step in that chain.  All we have to do is allege that Exxon's conduct was a substantial factor.

And we think given the size of the company, the many, many years in which this campaign went on, the broad consumer confusion.  We cited quite a bit of consumer confusion that most people are surprised, shocked, angry to find out that their plastic cannot be recycled.  And single-use plastics are the worst of all the plastics.  They're meant to be immediately discarded.

The vast majority of these are the resins that cannot be recycled whatsoever.  If they immediately get -- you may put them in the blue bin and go to a facility, but they immediately get turned around and --

THE COURT:  Are your claims premised on inference?  In other words, are there statements or positions that Exxon took that you pointed me to where the statement -- the unadorned statement effectively is made that, you know, our single-use plastics or polymer single-use plastics can be recycled?  Is it as brazened as that or is it we're all for recycling, we love recycling, and you're depending upon the argument that that is inferring to the populus here that it can be recycled?  Which is it?

MR. REDENBARGER:  So the statements have been as

brazen as these products can be and will be recycled.  They are effectively they can be recycled.

And one other point will be my last point --

THE COURT:  And is there -- just -- not to be too -- not to get too much in the weeds on it -- but is it there -- there isn't a dispute that there's some degree of recycling can go on with these products, it's your suggestion, as I understand it, that it's overstated.  It's suggesting there really -- recycling can take care of problem when it really can't.  But isn't it true that plastics, to some extent, can be recycled?

MR. REDENBARGER:  So, theoretically, anything could be recycled.  For plastics, the vast majority of plastics that can be recycled fall within -- there are seven resin types.  One and two, they get recycled more often than other types.  The percentages is small but it can -- it more likely can get recycled.  A lot of the other resins, three through seven, are, frankly, not recyclable, period.

THE COURT:  As counsel points out -- it's not necessarily critical to your case -- on my recycle bin, on the little sticker, it shows -- it says throw your plastics in here.  Right.  It does say that.  And it shows a picture of a little water bottle, if I recall correctly.  Is that wrong?

MR. REDENBARGER:  Recycling is not wrong.  As you pointed out, recycling is a good concept.  What we're alleging

is that Exxon's misleading campaign to tell everyone that this is the solution, that please buy as much plastic as you would like, please replace paper products, please replace aluminum products with plastic because, don't worry, we have this circular system, we'll take care of it.  That's what we allege is wrong.

And there is one paragraph I would like to point out in 91.  There are several quotes by Exxon that Exxon states that it knows that its plastic products will ultimately become pollution.  So there is more than just our allegations.

Exxon itself has knowingly admitted that plastic does and can become pollution.  And I think the knowing element takes us out of the product liability cases.  It brings us more into the nuisance cases like the Santa Clara and the Purdue.

Thank you.

THE COURT:  Okay.  Thank you.  Let me hear from Mr. McCarthy on the UCL and we'll move it along.

MR. MCCARTHY:  And much of the material has been covered because there's a lot of factual overlap.  I won't repeat any of that.

I would like to focus specifically on what we're alleging on the UCL.  We are not alleging a UCL fraud prompt.

THE COURT:  Okay.  So you don't even want -- if it came to that, you don't want leave to amend to try to bring that in and satisfy Rule 9?  You know, you're not asking me for

that?

MR. MCCARTHY:  Not as to that prong, Your Honor.  And the reason, frankly, is those cases -- as the Court is aware, you've had many of them -- are typically when a consumer buys a product, the product has a certain label, and the label misrepresents them.  That's the fraud cases.

That's not what we have.  We have -- and it's an unfair business practice case.  That's the focus, as Your Honor has pointed out.  And I think what has happened here is --

THE COURT:  And let's drill down on the prongs.  The -- you do make an argument on the illegal prong.

MR. MCCARTHY:  We did.

THE COURT:  Tell me about that again.

MR. MCCARTHY:  Certainly, Your Honor.

On the illegal prong, we're arguing that tethering is to the Public Interest Doctrine in California, 12600.  States that it's the policy of the State to prevent pollution and destruction of natural resources through the events that were described quite aptly by Mr. Redenbarger.  We think that is the tethering that allows us to get the illegal prong.

THE COURT:  Okay.  You would agree with me that it's a little more amorphous than the usual illegal prong argument I get which is you violated statute X, and this is almost a policy against pollution, and, therefore, it's illegal is what you're arguing.

34

MR. MCCARTHY:  That is what I'm arguing, Your Honor.  That is a codified law in the State of California.  I agree with the Court completely.  It is not the typical specificity of a regulation that is pointed to.

However, it is the public trust doctrine, California Code 12600.  It is a very important part of our legislative history on preservation of our natural resources.  And although it's a broad statute, it still conforms the basis of illegality.

THE COURT:  Okay.  How about the fairness prong.

MR. MCCARTHY:  Let me speak to the fairness prong, if I could, Your Honor.  First of all, on the fairness prong, it's really two buckets we're talking about if you think about it in terms of liability.

First, overproduction.  Just overproduction of single-use plastics.  And we cite to that at paragraphs 15, 63, 91, 145, 150, and 103 to 111.

And the second bucket is what we would call hiding facts about single-use plastics and greenwashing.  And certainly the misrepresentations counsel references come in that bucket two.  And I would point the Court to some of our allegations.  Counsel says we don't have detailed allegations on that.

I would point the Court to 1, 4, 12, 75, 85, 96 to 102, and 137.  With respect to allegations that Exxon knew it

was creating so much single-use plastic that it could not possibly be recycled, yet they gave an outward face to the public, this is not a problem; we can all roll forward happily here and it's all under control.  That's the core problem.

And I would like to point out a couple comments counsel made with respect to misleading statements.  And she referenced the New York Times article.  This is 127 our complaint.

It says many plastics can be recovered, processed, and turned into new products.  So what's the big deal?  That's true.

Well, if you look at paragraph 119, we point to an internal Exxon document from around the same time period which is early '70s that says they knew less than two percent of the waste can be recycled.  So when you make one statement externally and you make one statement internally, we think that forms the basis of an unfair business practice claim.

And I can give the Court one other brief example. Counsel talked about, well, foam trays.  Foam -- a type of plastic -- can be disposed of easily and safely and that's at paragraph 113 of our complaint.

What's the big deal?  It can be.  Well, if you keep reading the complaint and you look down at Paragraph 97, as early as 1971, Exxon knew foam was not biodegradable.

Again, that's one of their internal documents.  So

their outward facing statements are different from their inward documents.

But the main thrust, Your Honor, is on 17200. We do allege unfairness. We do allege illegality. We're not focused on fraud for the reasons stated. We think we have stated a claim on both unfairness and illegality. If for any reason the Court thinks we have not, we would request leave on that point.

Thank you, Your Honor.

THE COURT: Thank you. And, Ms. Park.

MS. PARK: Good afternoon, Your Honor. Grace Park.

I wanted to turn to, first, the public interest exception. And counsel states that -- counsel states that nonprofits are not -- are seeking special relief for themselves. They are not.

With respect to -- they're not seeking anything greater or different than the State of California. With respect to -- with respect to the private public nuisance that we discussed, private nuisance is an element of the broader public nuisance claim. So we did want to emphasize in the complaint that they are solely seeking -- or they are solely asserting standing with respect to that private nuisance. They're not seeking anything different or greater than any other Californian with respect to that claim.

With respect to whether or not nonprofits involvement is necessary, in the complaint -- or in the reply, they say

that this claim is duplicative and that we should not be encouraging duplicative actions.  That's another irony I think that's going on here in that Exxon created that duplication.  They stipulated to relate this case.

At the hearing on motion remand, you asked Exxon a few times do you want to litigate in separate courts and they said yes.  So I don't think that the standard is either the Government or the Attorney General has the exemption under 425.16 or the --

THE COURT:  Well, had I not remanded the stayed claimant, the G claim couldn't -- and they were -- and both of those claims were still with us here, they would be within their rights to argue that I should dismiss you because the State -- in other words, the fact that they've now gotten the case in -- or not that they sought this -- but in -- the reality is it's in two different places.

I don't think it's fair necessarily to say they've orchestrated a divide and now it's like divide and conquer.  They would have made the argument if you were together with the AG now and I had denied the remand motion, they would say you still should go.  Wouldn't they?

MS. PARK:  Right.  And so I think what the point here is -- their contention is duplicative equals necessary and the statute calls for necessary.  And I don't think what necessary means is you're in two different courts.  It's looking at what

is the necessity of nonprofits.

And the nonprofits here bring a great deal of experience and are long-standing experts in the field of pollution.  And there are public private partnerships in the terms of pollution.

THE COURT:  Are the claims -- and we went over this at the remand stage and you can remind me -- the claims that the Attorney General is bringing, are they more or less the same as the claims that you're bringing?

MS. PARK:  Yes.

THE COURT:  Okay.

MS. PARK:  Yes.  I believe that the AG has slightly broader claims or some additional causes of action that the nonprofits do not have, but, yes.

THE COURT:  Okay.  You can talk if you want about the commercial exemption.

MS. PARK:  Sure.  And I want to note one thing about the commercial speech exemption is Exxon's counsel said that they are not in the business of recycling.  That's not true.  And I think that that is demonstrated by fact that in the Texas lawsuit, Exxon has sued the nonprofits for business torts and defamation with respect to their advanced recycling business.

So to the extent they're talking about advanced recycling, could they be talking about matters of public interest, certainly.  But they're also talking about their own

business in the advance recycling business.  And so the commercial speech does apply to their business operations with respect to advanced recycling.

The same is true with respect to mechanical recycling. Throughout the 1990s -- and I believe Exhibit 9 speaks about that in the RJN.  They -- Exxon Mobil and seven other companies were part owners of the National Polystyrene Recycling Company so they were in the business of mechanical recycling as well.

So to the extent they are speaking about recycling and plastic packaging, they were in both businesses.  So the commercial speech exemption does apply to all of those statements.

THE COURT:  Okay.

MS. PARK:  I want to talk about one more point before turning it over and that is throughout the reply, Exxon suggests that the Court only needs to look at the content of the speech in the complaint, and that's just not true.  In FilmOn, the Court -- the California Supreme Court in FilmOn articulated that 425.17, the commercial speech exemption speaks specifically about context and how context matters.

It outlines who the speaker is.  It outlines who the audience is, whether it's a regulator, a potential customer or an actual customer.  It talks about the purpose, whether it is for sales of a good, a service, securities, financial transactions.  So certainly the speaker, the audience, and the

purpose are embedded in that statute.

The same goes FilmOn said for 425.16.  And not only that but 421.16(b)(2) talks about you need affidavits to support your anti-SLAPP motion.  So certainly it's not just the content of the speech standing alone that is considered.  It is, again, context being the speaker, the audience, and the purpose.

And with respect to -- they make one more statement in their reply that it seems to suggest that (e)(3) -- the sub prong (e)(3) -- does not apply the two step prong in (e)(4).  That's not true either because both of them have the language "in connection with."  And in both instances, both statutes have "in connection with," and FilmOn specifically articulated the two part step in interpreting "in connection with."

THE COURT:  Thank you.

MS. PARK:  Thank you.

THE COURT:  Ms. Sestito.

MS. SESTITO:  Yes.  Thank you, Your Honor.

So I'm going to start with nuisance.  And Mr. Redenbarger said that he thought what made this a nuisance is the knowledge that they plead that Exxon Mobil had knowledge.  Knowledge is not enough for public nuisance, Your Honor.  None of the cases that he talked about that are cited in their briefs is knowledge what turns the distinction between public nuisance and product liability.

It is -- and I can walk through the cases -- but it, in Modesto, for example, Modesto I -- the Court found that when somebody was just selling the chemical that was sold to the dry-cleaners with the knowledge that it would -- if poured into the ground or down a drain would pollute the ground, that that was not sufficient. The distinction the City of Modesto set up was a specific instruction to the user to dispose of it, that hazardous waste in an unsafe manner by pouring it down a drain or into a sewer.

Similarly, in Merced -- City of Merced -- selling gas that includes NTBE with the knowledge that it is dangerous and failing to warn people about proper disposal, that was not a public nuisance either. They specifically allege knowledge that was not sufficient. The Court said that there needed to be an instruction to the purchasers to use it in a hazardous manner or that there was affirmative promotion to use it in a hazardous manner.

That's exactly what happened -- that was the allegation in Santa Clara and Conagra, the lead paint cases, that there was promotion for that hazardous use. It was not just based on the knowledge. The knowledge enough was not sufficient.

Similarly, Purdue Pharma, certainly knowledge was part of it, but what took it to public nuisance if you look at Judge Breyer's decision is the misleading promotion for that unlaw

use, the illegal use, or the illegal distribution for that illegal use.  And those fall right within Team Enterprises.  And it was interesting to me, Your Honor, that Mr. Redenbarger defined the nuisance here as the plastic pollution.

Well, Team Enterprises is a pollution case.  Not plastic pollution, but pollution of those chemicals.  And what Team Enterprises says is that to be liable for nuisance, you have to affirmatively instruct the polluting entity to dispose of a hazardous substance in an improper or unlawful manner.  Or you have to manufacture or install the disposal system that leads to that.  And they've not alleged either of those things.  There's no allegation of a specific instruction.

And if you look at Hinds, Hinds actually contains statements that -- these were the statements at issue that waste water may be drained into a container or piped directly to a floor drain, that it should be piped into an open sewer.  And the Ninth Circuit in that case found that that was not sufficient, that those instructions -- that those were recommendations, not an instruction.

And, here, all they're saying is that we said at some point in time that some plastics can be recyclable.  A statement which, as Your Honor said, is completely true.  Some plastic can be recycled and are recycled.  And so to -- there is no nexus between the statements and the conduct alleged in this complaint that ties it to the public nuisance conduct in

these other cases.  And knowledge alone is not enough.

And under the San Diego case, Your Honor, that is the case that involved asbestos.  It was the same thing that they sold asbestos with knowledge that it would cause harm.  It was put into buildings and people were harmed by that.  And the California Court of Appeals said that was the first case where they said, well, if we say this is a nuisance, then it's going to swallow the entirety of tort law in a single gulp and that is where that line first came from.

So the other piece on causation is I still don't understand if the nuisance is the plastic pollution.  Counsel went through the chain events.  Which is Exxon produces the polymers, they sell it to another company, that company creates products that they sell to another company, that company sells those products to consumers.  I don't understand the next step.  So then how does it become plastic pollution?

And I think that is the part we're saying has not been articulated.  And I agree they don't have to prove it at this stage.  They don't have to have direct evidence at this stage, but they have to plead plausible facts to support it and that goes to, Your Honor, to the promotion.

Like all of this -- they can say over and over again that Exxon is misleading the public, but they have to plead facts in support of that.  Just saying that Exxon is misleading the public is a conclusory statement.  They have to plead

plausible facts to support, which is why I do believe that the Court has to go through those -- you know, those allegations and those statements.

On the -- and as Your Honor said, right, the bins here in California tell us to put our plastic into those bins.  So on a causation theory, it's hard for me to understand that if the concern is that people falsely believe plastics are recyclable, why that comes from these 12 statements over many decades as opposed to the stickers that are literally on the recycling bin at my house that I go to multiple times a week to throw out my trash.

And as Mr. Redenbarger said, recycling is not wrong.  That's a statement that he made.  Right.  If recycling is not wrong, how can telling people to recycle be a promotion for a hazardous use or unsafe use or an illegal use.

THE COURT:  They would say because it's not just recycle.  They contend what you're saying is recycle something that you misleading lead them to believe is subject to being recycled.  So it's not just, you know, telling people -- they're not saying you're culpable because you're telling people please recycle.  It's a little more subtle than that.

MS. SESTITO:  But I think that's the question, Your Honor.  So if we can tell people to please recycle, why can't we say many plastics can be recycle.  Or why can't we say that advanced recycling --

THE COURT: Their theory is because what you're doing is suggesting something which is not true which is you're leading the marketplace to believe that things can be recycled, which at least to the extent they say you are suggesting it, are not subject to being recycled, and then they're mislead and they -- off we go.

MS. SESTITO: But right now, the State of California and cities and counties say please recycle. And they say that all the time. Right. And they put those stickers on the bins, Your Honor. And so is that also a public nuisance?

THE COURT: Remember, for good or for bad, what they're claiming is whatever the State of California is saying and whatever their state of knowledge may be, they're saying your state of knowledge is you know it's not true and yet you're still making -- I'm just saying what they say -- I'm not saying you win or you lose.

MS. SESTITO: Right. But they're saying now it's public knowledge that everyone knows that you can't recycle. Right. Or that it's not recycled at the levels --

THE COURT: At the level, yeah.

MS. SESTITO: -- people expected. It's at a lower level. I think it's completely implausible, Your Honor, to suggest that the State of California -- that the state agency, CalRecycle, was not aware of it. That's the state agency that tracks recycling within the state.

So any suggestion -- and as Your Honor noted, I mean, those stickers, they remain on my recycling bin. They're on the recycling bin here in the Courthouse that I was just at in a cafe right before I came up to this courtroom. So if -- I just want to be clear that under this theory, right now the State of California, the Federal Government are all engaged in a public nuisance, because I think, at this point, the plaintiffs would agree, it is public knowledge that recycling occurs at whatever the rates are that they're alleging. I think it is completely implausible to suggest that the State and the Federal Governments have no knowledge of that, that the cities and counties have no knowledge.

So if they're out there telling people please recycle -- which they are -- that is also a public nuisance and that is part of our point when thinking about the implications of this what that means. And it is completely, like I said, implausible to suggest that the State does not have that knowledge when they're the ones in charge of the recycling and waste management infracture in this state.

I now want to just quickly go to UCL. I'll be very, very fast.

THE COURT: I have a 3:00 Zoom hearing so.

MS. SESTITO: Okay.

The fairness -- I think the way the fairness prong was described was completely amorphous, Your Honor. I don't think

it's tethered to anything.  And I think under Celltech, there has to be some kind of tethering to a law.

The unlawful prong is addressed in detail in the briefs and I think wasn't really addressed fair.  I do want to point out one slight of hand which is that counsel said that the issue with the UCL is that we knew -- and they pointed to paragraph 119 -- that we knew that plastics were only recycled at two percent, and close in time we went out and said something about recyclability.

Well, I ask the Court to look at that.  Because if you look at paragraph 118, which is the statement about the two percent, that's from 1972.  And then if you look at paragraph 120, which is the close in time, quote, statement, that is from 1989.

So those aren't close in time.  Those are very different time periods.  Many, many things from a technology perspective changed between 1972 and 1989, and it is completely I think -- I think it is incorrect to suggest that those statements were made at the same time that on the one hand we knew -- we were saying two different things at the same time.

And in terms of the anti-SLAPP, you know, those standards come directly from the statute, Your Honor, the exemptions.  And it says specifically, you know, for public interest, it has to be -- the prong is private enforcement is necessary.  And the way that the Courts interpret that that we

cited in our briefing -- and that includes the Tourgeman case, People versus Strathmann -- what they look at for that prong is has the Government filed a lawsuit.  Here, they have.  Your Honor is 100 percent correct if the State was still here, we still would have filed this anti-SLAPP motion as to Sierra Club.

And on the commercial speech exemption, Your Honor, similarly, there are a number of factors that need to be met. They have to be representation of facts about the business operation, goods, or services.  They have to be made for the purpose of obtaining -- of promoting or securing sales of a commercial transaction.

And, again, with the sole possible exception of that Hefty Bags statement, the rest of them were public statements in, you know, our sustainability reports.  They were in the newspaper.  They were responding to public dialogue about these issues, and the plaintiffs have haven't met these specific elements of the commercial speech exemption.

THE COURT:  Okay.  Well thank you very much.  Very helpful argument.  I will take the matter under submission and we'll be working on it.

MS. PARK:  Thank you, Your Honor.

MR. MCCARTHY:  Thank you, Your Honor.

THE COURT:  Thank you.

(The record was concluded at this point at 3:02 p.m.)


---oOo---

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

I, ANDREA K. BLUEDORN, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED this 21st day of July, 2025.


*/s/ Andrea K. Bluedorn*
Andrea K. Bluedorn, RMR, CRR


UNITED STATES DISTRICT COURT